# UNITED STATES *v*. RADIO CORPORATION OF AMERICA ET AL.

No. 54.   Argued December 8, 1958.—Decided February 24, 1959.

*Solicitor General Rankin* argued the cause for the United States. With him on the brief were *Assistant Attorney General Hansen, Daniel M. Friedman, Bernard M. Hollander* and *Raymond M. Carlson.*

*Bernard G. Segal* argued the cause for appellees. With him on the brief were *Edward W. Mullinix, Josephine H. Klein* and *Lawrence J. McKay.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

Appellees, Radio Corporation of America and National Broadcasting Company, are defendants in this civil antitrust action brought by the Government under § 4 of the Sherman Act, 15 U. S. C. § 4. After holding a preliminary hearing on three of appellees' affirmative defenses to that action, the federal district judge dismissed the complaint. 158 F. Supp. 333. The Government appealed directly to this Court under the Expediting Act, 15 U. S. C. § 29. The principal question presented is whether approval by the Federal Communications Commission of appellees' agreement to exchange their Cleveland television station for one in Philadelphia bars this independent action by the Government which attacks the exchange as being in furtherance of a conspiracy to violate the federal antitrust laws.

The Government's complaint generally alleged the following facts. In 1954, National Broadcasting Company (NBC), a wholly owned subsidiary of Radio Corporation of America (RCA), owned five very high frequency (VHF) television stations. The stations were located in the following market areas: New York, which is the country's largest market; Chicago, second; Los Angeles, third; Cleveland, tenth; and Washington D. C., eleventh. According to the Government's allegations, in March 1954, NBC and RCA originated a continuing conspiracy

to acquire stations in five of the eight largest market areas in the country. Since Philadelphia is the country's fourth largest market area, acquisition of a Philadelphia station in exchange for appellees' Cleveland or Washington station would achieve one goal of the conspiracy.[1]

One Philadelphia station, WPTZ, was owned by Westinghouse Broadcasting Company. This station and a Westinghouse-owned station in Boston were affiliated with the NBC network. In addition, Westinghouse desired NBC affiliation for a station to be acquired in Pittsburgh. In order to force Westinghouse to exchange its Philadelphia station for NBC's Cleveland station, it is alleged that NBC threatened Westinghouse with loss of the network affiliation of its Boston and Philadelphia stations, and threatened to withhold affiliation from its Pittsburgh station to be acquired. NBC also threatened to withhold network affiliation from any new VHF or UHF (ultra high frequency) stations which Westinghouse might acquire. By thus using its leverage as a network, NBC is alleged to have forced Westinghouse to agree to the exchange contract under consideration. Under the terms of that contract NBC was to acquire the Philadelphia station, while Westinghouse was to acquire NBC's Cleveland station plus three million dollars.

The Government asked that the conspiracy be declared violative of § 1 of the Sherman Act, 15 U. S. C. § 1, that the appellees be divested of such assets as the District Court deemed appropriate, that "such other and additional relief as may be proper" be awarded, and that the Government recover costs of the suit.

Appellees' affirmative defenses arose out of the fact that the exchange had been approved by the Federal Com-

---

[1] Under present FCC regulations, NBC can own no more than five stations, 47 CFR, 1958, § 3.636, so that acquisition of a new station would require that an existing one be relinquished.

munications Commission.[2]   FCC approval was required
under § 310 (b) of the Communications Act of 1934, 48
Stat. 1086, as amended, 66 Stat. 716, 47 U. S. C. § 310 (b).
Under that Section, appellees filed applications setting
forth the terms of the transaction and the reasons for
requesting the exchange.   The Commission instituted
proceedings to determine whether the exchange met the
statutory requirements of § 310, that the "public interest,
convenience, and necessity" would be served.   They were
not adversary proceedings.   After extensive investigation
of the transaction, the Commission was still not satisfied
that the exchange would meet the statutory standards,
and, over three dissents, issued letters seeking additional
information on various subjects, including antitrust prob-
lems, under § 309 (b) of the Act.   After receiving answers
to the letters, the Commission, without holding a hearing,
on December 21, 1955, granted the application to exchange
stations.[3]

---

[2] Federal Communications Commission Report No. 2793, Public
Notice 27067, December 28, 1955.

[3] Commissioner Bartley dissented from the action, urging that
hearings should have been held because the facts theretofore revealed
by the investigation had raised "serious questions as to the desir-
ability and possible legality of the competitive practices followed by
the network in obtaining dominance of major broadcast markets."
He suggested that there was "a substantial question whether, once
the Commission grants its approval to these transfers, certain provi-
sions of the Clayton Act (viz. 15 U. S. C. Section 18) might prevent
Federal Trade Commission and Justice Department from taking any
*effective* action in the event they concluded that possible violations of
the anti-trust laws were involved." (Emphasis by the Commissioner.)
Commissioner Doerfer, joined by Commissioner Mack, responded
that it was unnecessary to hold a hearing because the investigation
had fully revealed the facts. He concluded, however: "It is difficult
to see how approval of this exchange may effectively preclude other
governmental agencies from examining into this or any other trans-
action of the network companies."

It was stipulated below that in passing upon the application, the Commission had all the information before it which has now been made the basis of the Government's complaint. It further appears that during the FCC proceedings the Justice Department was informed as to the evidence in the FCC's possession. It was further stipulated, and we assume, that the FCC decided all issues relative to the antitrust laws that were before it, and that the Justice Department had the right to request a hearing under § 309 (b), to file a protest under § 309 (c), to seek a rehearing under § 405, and to seek judicial review of the decision under § 402 (b). See *Far East Conference* v. *United States,* 342 U. S. 570, 576; *U. S. ex rel. Chapman* v. *Federal Power Comm'n,* 345 U. S. 153, 155, 156. The Department of Justice took none of these actions. Accordingly, on January 22, 1956, after the period in which the Department could have sought review had expired, NBC and Westinghouse consummated the exchange transaction according to their contract. The Department did not file the present complaint until December 4, 1956, over ten months later.

Against this background, appellees assert that the FCC had authority to pass on the antitrust questions presented, and, in any case, that the regulatory scheme of the Communications Act has so displaced that of the Sherman Act that the FCC had primary jurisdiction to license the exchange transaction, with the result that any attack for antitrust reasons on the exchange transaction must have been by direct review of the license grant. Relying on this premise, they then contend that the only method available to the Government for redressing its antitrust grievances was to intervene in the FCC proceedings; that since it did not, the antitrust issues were determined adversely to it when the exchange was approved, so that it is barred by principles of collateral estoppel and *res*

*judicata;* and that in any case the long delay between approval of the exchange and filing of this suit bars the suit because of laches.

## I.

Whether these contentions are to prevail depends substantially upon the extent to which Congress authorized the FCC to pass on antitrust questions, and this in turn requires examination of the relevant legislative history. Two sections of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.,* deal specifically with antitrust considerations, Sections 311 and 313:

> "SEC. 311. The Commission is hereby directed to refuse a station license and/or the permit hereinafter required for the construction of a station to any per- son (or to any person directly or indirectly controlled by such person) whose license has been revoked by a court under section 313.
>
> .        .        .        .        .
>
> "SEC. 313. All laws of the United States relating to unlawful restraints and monopolies and to combinations, contracts, or agreements in restraint of trade are hereby declared to be applicable to the manufacture and sale of and to trade in radio apparatus and devices entering into or affecting interstate or foreign commerce and to interstate or foreign radio communications. Whenever in any suit, action, or proceeding, civil or criminal, brought under the provisions of any of said laws or in any proceedings brought to enforce or to review findings and orders of the Federal Trade Commission or other governmental agency in respect of any matters as to which said Commission or other governmental agency is by law authorized to act, any licensee shall be found

guilty of the violation of the provisions of such laws or any of them, the court, in addition to the penalties imposed by said laws, may adjudge, order, and/or decree that the license of such licensee shall, as of the date the decree or judgment becomes finally effective or as of such other date as the said decree shall fix, be revoked and that all rights under such license shall thereupon cease: *Provided, however,* That such licensee shall have the same right of appeal or review as is provided by law in respect of other decrees and judgments of said court."

These provisions were taken from the Radio Act of 1927.[4] They appear to have originated in a bill drafted by Congressman White of Maine, H. R. 5589, 69th Cong., 1st Sess. What is now § 311 appeared as the third paragraph of § 2 (C)[5] of that bill, while what is now § 313 appeared as § 2 (G).[6] In the hearings on the bill before

---

[4] 44 Stat. 1162. See H. R. Conf. Rep. No. 1918, 73d Cong., 2d Sess. 47, 49.

[5] "The Secretary of Commerce is hereby directed to refuse a station license and/or the permit hereinafter required for the construction of a station to any person, firm, company, or corporation, or any subsidiary thereof, which has been found guilty by any Federal court of unlawfully monopolizing or attempting to unlawfully monopolize radio communication, directly or indirectly, through the control of the manufacture or sale of radio apparatus, through exclusive traffic arrangements, or by any other means. The granting of a license shall not estop the United States or any person aggrieved from prosecuting such person, firm, company, or corporation for a violation of the law against unlawful restraints and monopolies and/or combinations, contracts, or agreements in restraint of trade."

[6] "All laws of the United States relating to unlawful restraints and monopolies and to combinations, contracts, or agreements in restraint of trade are hereby declared to be applicable to the manufacture and sale of and to trade in radio apparatus and devices entering into or affecting interstate or foreign commerce and to interstate or foreign radio communications. Whenever in any suit, action, or

the House Committee, Congressman Reid of Illinois asked Judge Davis, Department of Commerce representative, whether the Secretary of Commerce [7] had any discretion to refuse a license under § 2 (C) (now § 311) to a party which the Secretary believed to be violating the antitrust laws. The following colloquy ensued: [8]

> Judge DAVIS. "He has no discretion under this act."
>
> Congressman REID. "They have to be found guilty first; is that the idea?"
>
> Congressman WHITE. "Yes. In other words, I tried to get away from placing upon the secretary the determination of a judicial question of that character. That involves, of course, a determination as to the facts; it requires a knowledge of the law and it requires an application of the law to the facts, and then it requires the exercise of judicial powers, if you leave that in his discretion, and I tried to lift it away from the secretary."

---

proceeding, civil or criminal, brought under the provisions of any of said laws or in any proceedings brought to enforce or to review findings and orders of the Federal Trade Commission or other governmental agency in respect of any matters as to which said commission or other governmental agency is by law authorized to act, any licensee shall be found guilty of the violation of the provisions of such laws or any of them, the court, in addition to the penalties imposed by said laws, may adjudge, order, and/or decree that the license of such licensee shall, as of the date the decree or judgment becomes finally effective or as of such other date as the said decree shall fix, be revoked and that all rights under such license shall thereupon cease: *Provided, however,* That such licensee shall have the same right of appeal or review as is provided by law .in respect of other decrees and judgments of said court."

[7] As then phrased, the Act was to be administered primarily by the Secretary of Commerce.

[8] Hearings before the House Committee on the Merchant Marine and Fisheries on H. R. 5589, 69th Cong., 1st Sess. 27.

Later on, the question arose as to what grounds were available to the Secretary to revoke licenses under § 2 (F) (now § 312). After Congressman White mentioned one statutory ground, Congressman Reid observed: [9]

"Yes; but you do not include unlawful combinations and monopolies and contracts or agreements in restraint of trade. That is not covered."

Congressman WHITE. "No; not in that section."

Congressman DAVIS of Tennessee. "Those are covered in 'G' [now § 313]."

Congressman WHITE. "That is a judicial question and we have left it to the courts to pass on that."

This failure to include a provision permitting refusal of a license for antitrust violations in the absence of a judicial determination caused Congressman Davis to insert a lengthy Minority Report on H. R. 9108, which was old H. R. 5589 reintroduced by Congressman White.[10] Consequently, when the bill (then numbered H. R. 9971) reached the floor of the House, Congressman Davis attempted to insert a number of amendments which would have strengthened the antitrust aspects of the bill. See 67 Cong. Rec. 5484, 5485. All were defeated, including an amendment to § 2 (C) (now § 311) which would have required refusal of a license to any company "found by any Federal court *or the commission* to have been unlawfully monopolizing" radio communication. (Emphasis supplied.) See 67 Cong. Rec. 5501–5504, 5555.

Thus, in the Senate consideration of a version of the bill, when asked whether there was "anything in the bill providing in case the applicant for a permit is found to be acting in violation of the Sherman antitrust law or controls a monopoly that the commission may pass upon

[9] *Id.*, at 29.

[10] See H. R. Rep. No. 404, 69th Cong., 1st Sess. 6, 16, 23.

the question," Senator Dill of Washington, who was in charge of the bill in the Senate, replied: [11]

"The bill provides that in case anybody has been convicted under the Sherman antitrust law or any other law relating to monopoly he shall be denied a license; but the bill does not attempt to make the commission the judge as to whether or not certain conditions constitute a monopoly; it rather leaves that to the court."

Congress adjourned before any action could be taken on the bill at that session. At the next session, a Conference Committee reported out the version of the bills which became the Radio Act of 1927, with now § 311 being § 13 of the Act and now § 313 being § 15 of the Act, despite the vigorous but unsuccessful opposition of Congressman Davis in the House, see, *e. g.,* 68 Cong. Rec. 2577, and Senator Pittman of Nevada in the Senate. See, *e. g.,* 68 Cong. Rec. 3032, 3034.

Only one change was made in those two Sections when they were incorporated into the Communications Act. Section 311 was modified merely to authorize rather than to require the revocation of a license by the Commission after a court had found a radio broadcaster in violation of the antitrust laws, but had not ordered its license revoked, 48 Stat. 1086. In all other respects §§ 13 and 15 of the Radio Act were identical with, and had the same purpose as, §§ 311 and 313 of the Communications Act.[12]

While this history compels the conclusion that the FCC was not intended to have any authority to pass on antitrust violations as such, it is equally clear that courts retained jurisdiction to pass on alleged antitrust viola-

---

[11] 67 Cong. Rec. 12507.

[12] H. R. Conf. Rep. No. 1918, 73d Cong., 2d Sess. 47, 49.

tions irrespective of Commission action.  Thus § 311, as originally enacted in 1934, 48 Stat. 1086, read as follows:

"The Commission is hereby directed to refuse a station license and/or the permit hereinafter required for the construction of a station to any person (or to any person directly or indirectly controlled by such person) whose license has been revoked by a court under section 313, and is hereby authorized to refuse such station license and/or permit to any other person (or to any person directly or indirectly controlled by such person) which has been finally adjudged guilty by a Federal court of unlawfully monopolizing or attempting unlawfully to monopolize, radio communication, directly or indirectly, through the control of the manufacture or sale of radio apparatus, through exclusive traffic arrangements, or by any other means, or to have been using unfair methods of competition.  *The granting of a license shall not estop the United States or any person aggrieved from proceeding against such person for violating the law against unfair methods of competition or for a violation of the law against unlawful restraints and monopolies and/or combinations, contracts, or agreements in restraint of trade, or from instituting proceedings for the dissolution of such corporation.*" (Emphasis supplied.)

Appellees attempt to avoid the force of the italicized sentence in two ways.  First, they point to its repeal in the 1952 amendments to the Act, 66 Stat. 716.  That repeal was occasioned by objections from the industry that it was unfair for radio broadcasters who had been found in violation of the antitrust laws to be subject to license refusals by the Commission, even when the court as a part of its decree did not see fit to order the license revoked under § 313.  See S. Rep. No. 142, 82d Cong.,

1st Sess. 9. Congress accordingly repealed all of the Section following the first comma, including the italicized sentence. It apparently considered that inherent in the scheme of the Act was the right to challenge under the antitrust laws even transactions approved by the Commission, for the Conference Committee carefully noted that repeal of the italicized sentence would not curtail such a right: [13]

"To the extent that this section of the conference substitute will eliminate from section 311 of the present law the last sentence, which is quoted above, the committee of conference does not feel that this is of any legal significance. It is the view of the members of the conference committee that the last sentence of the present section 311 is surplusage and that by omitting it from the present law the power of the United States or of any private person to proceed under the antitrust laws would not be curtailed or affected in any way."

Thus, appellees' reliance on repeal of the last sentence of § 311 is clearly misplaced.

Second, appellees urge that the italicized sentence as originally enacted had a very narrow scope; that it was intended to insure only that the granting of a license would not estop the Government from prosecuting antitrust violations subsequent to the transaction giving rise to the license proceeding, or of which the transaction was merely a small part. They argue that the sentence was intended to permit only actions such as in *Packaged Programs* v. *Westinghouse Broadcasting Co.*, 255 F. 2d 708. But the language of the sentence cannot be naturally read in such a narrow manner, and it would take persuasive legislative history so to restrict its application. Appellees point to no such history, nor to any cases so holding.

[13] H. R. Conf. Rep. No. 2426, 82d Cong., 2d Sess. 19.

Thus, the legislative history of the Act reveals that the Commission was not given the power to decide antitrust issues as such, and that Commission action was not intended to prevent enforcement of the antitrust laws in federal courts.

## II.

We now reach the question whether, despite the legislative history, the over-all regulatory scheme of the Act requires invocation of a primary jurisdiction doctrine. The doctrine originated with Mr. Justice (later Chief Justice) White in *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426. It was grounded on the necessity for administrative uniformity, and, in that particular case, for maintenance of uniform rates to all shippers.[14] A second reason for the doctrine was suggested by Mr. Justice Brandeis in *Great Northern R. Co.* v. *Merchants Elevator Co.*, 259 U. S. 285, 291, where he pointed to the need for administrative skill "commonly to be found only in a body of experts" in handling the "intricate facts" of, in that case, the transportation industry.

Thus, when questions arose as to the applicability of the doctrine to transactions allegedly violative of the an-

---

[14] We recently explained the nature of the doctrine in *United States* v. *Western Pacific R. Co.*, 352 U. S. 59, 63–64:

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."

titrust laws, particularly involving fully regulated industries whose members were forced to charge only reasonable rates approved by the appropriate commission, this Court found the doctrine applicable.[15] *United States* v. *Pacific & Arctic R. Co.*, 228 U. S. 87; *Keogh* v. *Chicago & N. W. R. Co.*, 260 U. S. 156; *United States Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474; *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439; *Far East Conference* v. *United States*, 342 U. S. 570. At the same time, this Court carefully noted that the doctrine did not apply when the action was only for the purpose of dissolving the conspiracy through which the allegedly invalid rates were set, for in such a case there would be no interference with rate structures or a regulatory scheme.[16] *United States* v. *Pacific & Arctic R. Co.*, *supra; Georgia* v. *Pennsylvania R. Co.*, *supra.* The decisions sometimes emphasized the need for administrative uniformity and uniform rates,

---

[15] See, generally, 3 Davis, Administrative Law Treatise, §§ 19.05, 19.06; Jaffe, Primary Jurisdiction Reconsidered: The Anti-Trust Laws, 102 U. of Pa. L. Rev. 577; Schwartz, Legal Restriction of Competition in the Regulated Industries: An Abdication of Judicial Responsibility, 67 Harv. L. Rev. 436; von Mehren, The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction, 67 Harv. L. Rev. 929.

[16] This followed because, in the words of Mr. Justice Brandeis in *Keogh* v. *Chicago & N. W. R. Co.*, *supra*, at 161, ". . . a combination of carriers to fix reasonable and non-discriminatory rates may be illegal." This Court in *Georgia* v. *Pennsylvania R. Co.*, *supra*, took the position that shippers were entitled to have rates filed by carriers who were not parties to a conspiracy, even though the rates filed were the lowest which would be found to be reasonable. The risk that future filings would be at the uppermost limits of the zone of reasonableness was too great, and damage from the conspiratorial filings was presumed to flow. Of course, when the agency is permitted to exempt from antitrust coverage rates filed cooperatively, the doctrine equally applies to an attack on the alleged conspiracy. *United States Navigation Co.* v. *Cunard S. S. Co.*, *supra; Far East Conference* v. *United States*, *supra.*

*Keogh* v. *Chicago & N. W. R. Co., supra,* while at other times they emphasized the need for administrative experience in distilling the relevant facts in a complex industry as a foundation for later court action. *United States Navigation Co.* v. *Cunard S. S. Co., supra,* and *Far East Conference* v. *United States, supra,* as explained in *Federal Maritime Board* v. *Isbrandtsen Co.,* 356 U. S. 481, 497–499.

The cases all involved, however, common carriers by rail and water. These carriers could charge only the published tariff, and that tariff must have been found by the appropriate agency to have been reasonable. Free rate competition was modified by federal controls. The Court's concern was that the agency which was expert in, and responsible for, administering those controls should be given the opportunity to determine questions within its special competence as an aid to the courts in resolving federal antitrust policy and federal regulatory patterns into a cohesive whole. That some resolution is necessary when the antitrust policy of free competition is placed beside a regulatory scheme involving fixed rates is obvious. Cf. *McLean Trucking Co.* v. *United States,* 321 U. S. 67. Accordingly, this Court consistently held that when rates and practices relating thereto were challenged under the antitrust laws, the agencies had primary jurisdiction to consider the reasonableness of such rates and practices in the light of the many relevant factors including alleged antitrust violations, for otherwise sporadic action by federal courts would disrupt an agency's delicate regulatory scheme, and would throw existing rate structures out of balance.

While the television industry is also a regulated industry, it is regulated in a very different way. That difference is controlling. Radio broadcasters, including television broadcasters, see *Allen B. Dumont Laboratories*

v. *Carroll,* 184 F. 2d 153, are not included in the definition of common carriers in § 3 (h) of the Communications Act, 47 U. S. C. § 153 (h), as are telephone and telegraph companies. Thus the extensive controls, including rate regulation, of Title II of the Communications Act, 47 U. S. C. §§ 201–222, do not apply.[17] Television broadcasters remain free to set their own advertising rates. As this Court said in *Federal Communications Comm'n* v. *Sanders Bros. Radio Station,* 309 U. S. 470, 474:

> "In contradistinction to communication by telephone and telegraph, which the Communications Act recognizes as a common carrier activity and regulates accordingly in analogy to the regulation of rail and other carriers by the Interstate Commerce Commission, the Act recognizes that broadcasters are not common carriers and are not to be dealt with as such. Thus the Act recognizes that the field of broadcasting is one of free competition. The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition as it has done in the case of railroads . . . ."

---

[17] Under Title II, common carriers are required to furnish communications service on reasonable request and may charge only just and reasonable rates, § 201. Such carriers must file rates with the FCC, and can charge only the rates as filed, § 203. The Commission may hold hearings on the lawfulness of filed rates, § 204, and after hearings may itself set the applicable rate, § 205. Cf. 49 U. S. C. § 15 *et seq.,* 46 U. S. C. § 817. In view of this extensive regulation, Congress has provided that certain actions of telephone and telegraph companies may be exempted from the antitrust laws by the Commission, § 221 (a) and § 222 (c)(1). Cf. 49 U. S. C. §§ 5 (11), 5b (9) and 46 U. S. C. § 814. Such exemptions are, however, subject to review, see *Federal Maritime Board* v. *Isbrandtsen Co.,* 356 U. S. 481.

Thus, there being no pervasive regulatory scheme, and no rate structures to throw out of balance, sporadic action by federal courts can work no mischief. The justification for primary jurisdiction accordingly disappears.[18]

The facts of this case illustrate that analysis. Appellees, like unregulated business concerns, made a business judgment as to the desirability of the exchange. Like unregulated concerns, they had to make this judgment with knowledge that the exchange might run afoul of the antitrust laws. Their decision varied from that of an

---

[18] This conclusion is re-enforced by the Commission's disavowal of either the power or the desire to foreclose the Government from antitrust actions aimed at transactions which the Commission has licensed. This position was taken both before the district judge below, and in a Supplemental Memorandum filed in this Court, page 8:

"Concurrent with the jurisdiction of the Department of Justice to enforce the Sherman Act, the Commission, of course, has jurisdiction to designate license applications for hearing on public interest questions arising out of facts which might also constitute violations of the antitrust laws. This does not mean, however, that its action on these public interest questions of communications policy is a determination of the antitrust issues as such. Thus, while the Commission may deny applications as not in the public interest where violations of the Sherman Act have been determined to exist, its approval of transactions which might involve Sherman Act violations is not a determination that the Sherman Act has not been violated, and therefore cannot forestall the United States from subsequently bringing an antitrust suit challenging those transactions."

Nor was this position taken merely for the purposes of this litigation, for it has been the view of the Commission over a period of years. See Report on Uniform Policy as to Violation by Applicants of Laws of United States, FCC Docket No. 9572 (1950), 1 Pike and Fischer, Radio Regulation, Part III, 91:495; *National Broadcasting Co.* v. *United States,* 319 U. S. 190. Since, as Mr. Justice Brandeis observed, the doctrine of primary jurisdiction rests in part upon the need for the skill of a "body of experts," it would be odd to impose the doctrine when the experts deny the relevance of their skill.

unregulated concern only in that they also had to obtain the approval of a federal agency. But scope of that approval in the case of the FCC was limited to the statutory standard, "public interest, convenience, and necessity." See, generally, *Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266; *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134; *Federal Communications Comm'n* v. *Sanders Bros. Radio Station, supra; Federal Communications Comm'n* v. *RCA Communications,* 346 U. S. 86. The monetary terms of the exchange were set by the parties, and were of concern to the Commission only as they might have affected the ability of the parties to serve the public. Even after approval, the parties were free to complete or not to complete the exchange as their sound business judgment dictated. In every sense, the question faced by the parties was solely one of business judgment (as opposed to regulatory coercion), save only that the Commission must have found that the "public interest" would be served by their decision to make the exchange. No pervasive regulatory scheme was involved.

This is not to imply that federal antitrust policy may not be considered in determining whether the "public interest, convenience, and necessity" will be served by proposed action of a broadcaster, for this Court has held the contrary.[19] *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 222–224. Moreover, in a given case the Commission might find that antitrust considerations alone would keep the statutory standard from being met, as when the publisher of the sole newspaper in an area applies for a license for the only available radio and tele-

---

[19] See also Report on Uniform Policy as to Violation by Applicants of Laws of United States, FCC Docket No. 9572, 1 Pike and Fischer, Radio Regulation, Part III, 91:495.

vision facilities, which, if granted, would give him a monopoly of that area's major media of mass communication. See 98 Cong. Rec. 7399; *Mansfield Journal Co. v. Federal Communications Comm'n,* 86 U. S. App. D. C. 102, 107, 108, 180 F. 2d 28, 33, 34.

## III.

The other contentions of appellees fall of their own weight if the FCC has no power to decide antitrust questions. Thus, before we can find the Government collaterally estopped by the FCC licensing, we must find "whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication *of the issue in controversy." Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 403. (Emphasis supplied.) But the issue in controversy before the Commission was whether the exchange would serve the public interest, not whether § 1 of the Sherman Act had been violated. Consequently, there could be no estoppel. *Res judicata* principles are even more inapposite.

Similarly, there could be no laches unless the Government was under some sort of a duty to go forward in the FCC proceedings. But unless the FCC had power to decide the antitrust issues, and we have held that it did not, the Government had no duty either to enter the FCC proceedings or to seek review of the license grant.[20]

---

[20] It is relevant to note that the Commission is not expressly required to give the Government notice that antitrust issues have been raised in a § 310 (b) proceeding. Compare § 222 (c) (1) of the Act relating to common carriers, which expressly makes consolidations and mergers exempt from antitrust coverage if approved by the Commission, but which also expressly requires that notice be given to the Attorney General of the United States prior to approval.

Accordingly, the judgment of the District Court dismissing the action is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN concurs in the result, believing, as he understands part "I" of the Court's opinion to hold, that a Commission determination of "public interest, convenience, and necessity" cannot either constitute a binding adjudication upon any antitrust issues that may be involved in the Commission's proceeding or serve to exempt a licensee *pro tanto* from the antitrust laws, and that these considerations alone are dispositive of this appeal.

MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.