SIERRA CLUB, a non-profit California corporation, and Wyoming Outdoor Coordinating Council, Inc., a non-profit Wyoming corporation, Plaintiffs,

v.

Rogers C. B. MORTON, individually and as Secretary of the Department of the Interior of the United States, et al., Defendants.

Civ. A. No. C–4750.

United States District Court,
D. Colorado.

Aug. 2, 1974.

**1256**

H. Anthony Ruckel, and Allen W. Stokes, Denver, Colo., for plaintiffs.

James L. Treece, U. S. Atty., Charles W. Johnson, William Hickey, Asst. U. S. Attys., Denver, Colo., David W. Miller, Dept. of Justice, Washington, D. C., for Federal defendants.

Charles H. Habernigg and Richard D. Bach, Rives, Bonyhadi & Drummond, Portland, Or., for Pacific Power & Light Co.

James E. Bruce, Boise, Idaho, for Idaho Power Co.

Bryant O'Donnell and Richard W. Bryans, Lee, Bryans, Kelly & Stansfield, Denver, Colo., for Pacific Power & Light Co. and Idaho Power Co.

## OPINION AND ORDER

CHILSON, District Judge.

This action is brought by the plaintiffs seeking to enjoin the grant and use of rights of way over and permits for the use of Federal lands for the construction and operation of the Jim Bridger Thermal Electric Power Plant (Project) near Rock Springs, Wyoming, by Pacific Power and Light Company and Idaho Power Company.

Plaintiffs ground their claims for relief upon allegations that the defendants have not complied with the National Environmental Policy Act (NEPA), 42 U. S.C. § 4321 et seq.; the Federal Clean Air Act, 42 U.S.C. § 1857h–7(a, b) and Executive Order No. 11514, and therefore, the rights of way and permits heretofore issued are illegal and void and no further permits or rights of way should be granted until the defendants have fully complied with NEPA, the Federal Clean Air Act and Executive Order No. 11514.

The power plant, to consist of three 500 megawatt thermal-electric generators, will supply customers of the Idaho Power Company (Idaho) and the Pacific Power & Light Company (Pacific) in Idaho and the Pacific Northwest. The three units have staggered completion dates, the first to begin operation in June 1974. The first unit will supply power to customers in Idaho, the second and third to customers in Oregon, Washington and Northern California. The coal necessary to operate the plant will be strip-mined from 5,000 acres of land located four miles northeast of the plant. Three 345 KV transmission lines will be constructed to deliver the power to the areas to be serviced.

Although the Project will be privately financed and operated, its construction and operation requires rights of way over and permits for the use of lands of the United States for power transmission, water, water lines, and other purposes.

Early in 1970, Idaho and Pacific advised the Bureau of Land Management (BLM) officials in Wyoming and Idaho of the proposed Project and that application for Federal permits and rights of way would be made. The BLM determined that the grant of such permits and rights of way would constitute ". . . major Federal actions significantly affecting the quality of the human environment." Upon such a finding § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S. C. § 4332(2)(C) required that BLM prepare an environmental impact statement (EIS).

On October 22, 1971, the Department of Interior published a "second draft" environmental impact statement (EIS) on the Project. (Intervenors' Exhibit II.) This draft was made available to Federal, State and local agencies and the public for comment. Many comments were received, including ones from the EPA (Exhibit B, Defendants' Motion for Summary Judgment), from H. Anthony Ruckel, attorney for the plaintiffs, the Sierra Club, the Sierra Club's consulting expert, Dr. Michael C. Williams, and the Wyoming Outdoor Coordinating Council, Inc. (See Part II of Exhibit I for compilation of comments received.)

After consideration of the comments received, substantial changes were made in the draft statement and a final envi-

ronmental statement (FES) was made available to the Council on Environmental Quality and the public on July 27, 1972. Notice of availability was published in the Federal Register on August 31, 1972.

On October 27, 1972, three months after issuance of the FES, the BLM issued the first rights of way for the Project. The complaint in this case was filed on February 8, 1973.

The defendants are: Rogers C. B. Morton, Secretary of the Department of Interior; Burton Silcock, Director of the Bureau of Land Management; Garth Rudd, Director of the Denver Office of BLM; Daniel P. Baker, Wyoming State Director, BLM; William D. Ruckelshaus, Administrator of the Environmental Protection Agency; John A. Green, Regional Administrator of the EPA; and Sheldon Meyers, Director of the Office of Federal Activities, EPA.

After the complaint was filed and the defendants had answered, Pacific and Idaho jointly moved for leave to intervene as defendants. The motion was not opposed and was granted.

The complaint states three claims for relief.

In the first claim for relief, plaintiffs allege that the defendants from the Department of Interior and the Bureau of Land Management have failed to comply with § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S. C. § 4332(2) in that the FES was not a "detailed statement" as that section requires.

In the first claim, plaintiffs pray for a declaratory judgment that the rights of way granted are unlawful and without legal effect because of the inadequacy of the FES and seek to enjoin the defendants, Morton, Silcock, Rudd and Baker from granting further rights of way until compliance with NEPA has been achieved.

The second claim is directed against the administrator of the Environmental Protection Agency (EPA) and alleges that the administrator's criticism of the "second draft" of the Environmental Impact Statement constituted a finding that the Project was "unsatisfactory" from the standpoint of public health or welfare or environmental quality and that the administrator's failure to publish this determination was in violation of § 309(b) of the Clean Air Act, 42 U. S.C. § 1857h–7(b). For relief under the second claim, plaintiffs pray for a mandatory injunction ordering defendants Ruckelshaus, Green, and Meyers to publish as their determination that the Project is "unsatisfactory from the standpoint of public health or welfare or environmental quality" and requiring them to refer the matter to the Council on Environmental Quality for decision as required by the Clean Air Act.

The third claim for relief alleges that by virtue of Executive Order No. 11514 (March 5, 1970), which commands Federal agency heads to monitor, evaluate, and control agency activities to protect and enhance the quality of the environment, and by virtue of NEPA and the Clean Air Act, government officials may not authorize action which will cause significant deterioration of existing air quality. Plaintiffs further allege that the defendants Morton, Silcock, Rudd and Baker have permitted significant deterioration of existing air quality by granting the rights of way for the Project.

By the third claim, plaintiffs seek a declaration that the rights of way granted are unlawful and without effect and seek an injunction against the use of the rights of way granted until Ruckelshaus and Morton have referred the matter to the Council on Environmental Quality and until it has been determined by this Court that the Project will operate in a manner which will not cause significant deterioration of air quality.

The Federal defendants and the intervenors have filed motions for summary judgment on all three claims; plaintiffs have moved for summary judgment on their second and third claims, and briefs

and supporting documents have been filed in support of and in opposition to the motions.

The parties have waived hearing and oral argument and have requested the Court to dispose of the motions upon the record now before it.

There is no genuine issue as to any material fact and the summary judgment motions are ripe for determination on their merits.

### First Claim—Sufficiency of the Final Environmental Impact Statement

By the first claim, plaintiffs challenge the sufficiency of the final draft of the environmental impact statement (FES) prepared by the Bureau of Land Management. Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, sets forth the required contents of such a statement. It provides, in pertinent part:

"The Congress authorizes and directs that to the fullest extent possible . . . (2) all agencies of the Federal Government shall

. . . . . .

(C) include in every recommendation or report on proposals for legislation *and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on*

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332 [Emphasis added]

The Tenth Circuit Court of Appeals has defined the scope of NEPA and § 102(2)(C) as follows:

"The mandates of the N.E.P.A. pertain to procedure and not to substance, that is, decision making in a given agency is required to meet certain procedural standards, yet the agency is left in control of the substantive aspects of the decision. The N.E.P.A. creates no substantive right in citizens to safe, healthful, productive and culturally pleasing surroundings. Instead, the responsible agency is required to take these factors into account at some point before commencement of the project." Upper Pecos Ass'n v. Stans, 452 F.2d 1233 (10th Cir. 1971)

Generally, the environmental impact statement is intended to provide a basis for weighing the benefits of the proposed Project against its expected environmental risks. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).

More recently, (October 1973) the Tenth Circuit Court of Appeals in National Helium Corporation v. Morton, 486 F.2d 995 (10th Cir. 1973) had occasion to consider in detail the standards by which the sufficiency of a final environmental impact statement (FES) is to be determined.

The Tenth Circuit referred to the decision of the D.C. Circuit, Scientists' Institute for Public Information v. Atomic Energy Commission, 156 U.S.App.D.C. 395, 481 F.2d 1079 and quoted therefrom as follows:

" 'It is apparent, however, that the Commission seeks to avoid issuing its forthcoming 'environmental survey' as an impact statement under Section 102, not out of any desire to circumvent NEPA's procedural requirements, but rather because of a fear that Section 102's requirements as to the contents of an impact statement are so

strict, particularly as to the need for 'detail' in the statement, that any Commission attempt to issue its environmental survey as a NEPA statement would be doomed to failure. While we do not altogether understand the Commission's fears, we feel they are based on certain misapprehensions as to what NEPA requires.

\* \* \* \* \* \*

" 'Accordingly, if the Commission's environmental survey is prepared and issued in accordance with NEPA procedures, and if the Commission makes a good faith effort in the survey to describe the reasonably foreseeable environmental impact of the program, alternatives to the program and their reasonably foreseeable environmental impact, and the irreversible and irretrievable commitment of resources the program involves, we see no reason why the survey will not fully satisfy the requirements of Section 102(C).' "

The Tenth Circuit in National Helium then stated:

"The environmental impact statement should be placed in perspective. The relevant provisions bring environmental factors into the agency decision-making placing them on an equal footing with economic, technical and other considerations. Also, this environmental impact statement serves as source material for the head of the agency, the Congress, the President and the public. See Calvert Cliffs' [Calvert Cliffs' Coord. Com. v. U. S. A. E. Com'n, 146 U.S.App.D.C. 33, 449 F. 2d 1109 (1971)], supra. If the agency had failed altogether to follow out the procedure required by NEPA, the arbitrary and capricious standard might well apply.

That is not our present problem. The rule of reason is a more appropriate standard where the sufficiency of the statement is being tested.

"In summary, then, our view is that the review of FES is limited to the following:

"(1) Whether FES discusses all of the five procedural requirements of NEPA.

"(2) Whether the environmental impact statement constitutes an objective good faith compliance with the demands of NEPA.

"(3) Whether the statement contains a reasonable discussion of the subject matter involved in the five required areas."

We test the FES in this case by these standards.

■ The FES is found in the record as Intervenors' Exhibit 1. Volume 1 of Exhibit 1 is the statement itself and Volume 2 of Exhibit 1 contains a statement of the consultation and coordination during the course of the drafting of the statement, a distribution of the draft statement and the comments and correspondence received during the course of the drafting proceedings. The comments received by the drafting agency are considered a part of the FES. National Helium Corporation v. Morton, 486 F.2d 995 at 1003.

■ In our opinion, the FES in the instant case clearly meets all three of the requirements of National Helium set forth above.

After first describing the proposal to construct and operate the Project and after first describing the existing environment in considerable detail, the FES (Exhibit 1 Part 1) specifically discusses the environmental impact of the proposed action. (See Pages II–I to V–58.) At Pages VII–1 through VII–15, is discussed the measures to be taken to enhance, protect, or mitigate impacts.

At Pages VII–1 to VII–3 is discussed the adverse impacts which cannot be avoided by the construction and operation of the Project.

At Pages X–1 to X–14 is discussed the alternatives to the proposed action.

At Pages VIII–1 to VIII–2 is discussed short term use versus long term productivity.

At Page IX–1 is discussed the irreversible and irretrievable commitment of resources.

The FES shows that the five areas mentioned in § 102(2)(C) were discussed; that the preparation of the statement was objective; that it was made in good faith, after mature deliberation and consideration of comments received from Federal, State and local agencies and the public, and constitutes a reasonable discussion of the subject matters involved.

Part II of Exhibit I, Pages XI–1 through XII, contains a summary of the consultation and coordination that preceeded the final draft of the environmental statement. Meetings were held over a period of many months with some 11 Federal and 13 State agencies, 15 local and private entities were consulted and public meetings were held.

After a first or primary draft statement was made, a "second draft" statement was printed and distributed to State and Federal agencies and to organizations and individuals for their consideration and comment.

The replies and comments received are many and voluminous and are contained in Part II of Exhibit 1. More than two years were spent in study, preparation, discussion, drafting and redrafting before the FES was adopted and published.

No issue of bad faith or lack of objectivity has been raised. The FES is attacked because it does not contain sufficient detail.

Applying the rule of reasonableness adopted by the Tenth Circuit in National Helium (supra) we are of the opinion that the FES meets the required standards and the plaintiffs' first claim for relief is without merit.

### Second Claim—§ 309 of the Clean Air Act

Plaintiffs base their second claim on the alleged failure of the Administrator of the Environmental Protection Agency to comply with the requirements of § 309 of the Clean Air Act as amended in 1970, 42 U.S.C. § 1857h–7(b), which provides:

> "In the event the Administrator determines that any such * * * action * * * is unsatisfactory from the standpoint of public health or welfare or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality."

■ Plaintiffs argue that the defendant Ruckelshaus' comments on the second draft of the Jim Bridger environmental impact statement, in which the Administrator listed eleven subjects where the draft impact statement was deemed to lack information or where the project as then described could have adverse environmental effects, constituted a finding that the Jim Bridger Plant was "unsatisfactory from the standpoint of public health or welfare or environmental quality"; and that the Administrator's failure to publish the finding and refer the matter to the Council on Environmental Quality is in violation of 42 U.S.C. § 1857h–7(b). In the alternative, the plaintiffs allege that even if the comments on the second draft EIS did not constitute a finding of "unsatisfactory", § 1857h–7(b) places a non-discretionary duty upon the Administrator in these circumstances to make such a finding, and failure to do so is unlawful.

The facts material to this claim are uncontroverted. The EPA comments on the second draft EIS are included in the final draft FES. In addition, the defendants have attached other documents in support of their motion for summary judgment on this claim, pertaining to the Administrator's intent when these comments were made, which documents also establish the procedure the Administrator has followed in reviewing the EIS and the Jim Bridger Project.

From these documents there appear no facts showing that the defendant Ruckelshaus made a finding as described in § 1857h–7(b). Nowhere in the com-

ments on the second draft EIS, dated February 4, 1972, does the administrator use the word "unsatisfactory" to describe the project as a whole or any part thereof. Exhibit III, attached to the intervenors' memo in support of their motion, is a copy of an EPA notice setting forth its finding on various environmental impact statements including the Jim Bridger Project, published in the Federal Register, Volume 37, No. 60, March 28, 1972. In this notice, the EPA sets out a code describing the general nature of its comments as follows:

### Appendix III

(1) *General agreement/lack of objections.* The Agency generally:

(a) Has no objection to the proposed action as described in the draft impact statement;

(b) Suggests only minor changes in the proposed action or the draft impact statement; or

(c) Has no comments on the draft impact statement or the proposed action.

(2) *Inadequate information.* The Agency feels that the draft impact statement does not contain adequate information to assess fully the environmental impact of the proposed action. The Agency's comments call for more information about the potential environmental hazards addressed in the statement, or ask that a potential environmental hazard be addressed since it was not addressed in the draft statement.

(3) *Major changes necessary.* The Agency believes that the proposed action, as described in the draft impact statement, needs major revisions or major additional safeguards to adequately protect the environment.

(4) *Unsatisfactory.* The Agency believes that the proposed action is unsatisfactory because of its potential harmful effects on the environment. Furthermore, the Agency believes that the safeguards which might be utilized may not adequately protect the environment from hazards arising from this action. The Agency there-

fore recommends that alternatives to the action be analyzed further (including the possibility of no action at all). Fed.Reg., Vol. 37, No. 60 p. 6350 (March 28, 1972).

The notice lists the Jim Bridger EIS "second draft" as falling into category "3", that is, "Major changes necessary." Subsequent to the comments on the second draft, a final draft was completed and submitted to the EPA. The EPA's and Mr. Ruckelshaus' approval of the FES are expressed in the letter to Secretary Morton, dated September 12, 1972 (attached to the defendants' memorandum on this motion). This EPA position was communicated to the Sierra Club counsel, H. A. Ruckel, by letter from the Assistant Administrator, John R. Quarles, dated September 13, 1972.

Clearly, from the classification assigned to the project in the Federal Register and from the letter communicating the Administrator's approval of the FES, there has been no finding by the Administrator that it was "unsatisfactory" pursuant to 42 U.S.C. § 1857h–7(b).

The plaintiffs' alternative contention that under the facts defendant Ruckelshaus had a non-discretionary duty to find the EIS and the project "unsatisfactory" has no basis in law. There are two subsections in 42 U.S.C. § 1857h–7(b). Subsection (a) requires the Administrator to review and comment on the environmental impact of federal actions and to make his conclusions public. Subsection (b) requires that *"in the event the Administrator determines* that any such . . . action . . . is unsatisfactory . . ., *he shall publish* his determination and *the matter shall be referred* to the Council on Environmental Quality." 42 U.S.C. § 1857h–7(b) [Emphasis Added].

■ Section 1857h–7(b) places a mandatory duty upon the Administrator only in the event that he determines the action is "unsatisfactory." No qualifications are placed on this determination, and no restrictions or standards are set out to direct the Administrator in find-

ing or refusing to find the action unsatisfactory. The language therefore clearly places such a finding within the full discretion of the Administrator and places no duty upon him to publish or go to the CEQ unless he deems the action unsatisfactory.

Contrary to plaintiffs' contention, the legislative history also supports the conclusion that the functions of the Administrator of the EPA in determining the unsatisfactoriness of a federal action are discretionary. Section 1857h–7 of 42 U.S.C. was added to the Clean Air Act by amendment, § 309, P.L. 91–604, 84 Stat. 1709, December 31, 1970. The provisions of this section were the result of a Conference Committee compromise between the House version and the Senate version. Subsection (b) was taken directly from the Senate Bill S.4358, § 310(b), except that the final version assigned the determination and duties to the Administrator instead of the Secretary of HEW, upon whom the burden fell in the Senate version. In describing the function of the Secretary under § 310(b) of the Senate version, the Senate Report stated:

> "[T]he Committee bill would require that any detailed statement which contains any matter related to the duties and responsibilities granted to the Secretary pursuant to the Clean Air Act . . . be reviewed by the Secretary for his analysis of the statement with respect to public health and welfare and environmental quality. If the Secretary should determine that a detailed statement is inadequate, he would refer the matter to the Council on Environmental Quality for a determination and recommendation to the President." S.Rep.No.91–1196, 91st Cong., 2nd Sess., pp. 43–44 (1970).

From the above discussion, it is clear that the Senate contemplated that the determination of the unsatisfactoriness of the FES would be within the discretion of the Secretary and that no duty would be placed on the Secretary until he made a finding that the FES was unsatisfactory.

The Conference Report No. 91–1783 sheds no light upon the meaning the Conference Committee placed on the final version of § 1857h–7(b). The conference report makes no reference to the Administrator's function other than that he is to review and comment on federal actions and publish those comments. Conference Report No. 91–1785, 91st Cong., 2nd Sess., pp. 57–58 (1970). The latter reference appears to relate to § 1857h–7(a) and not to the provisions of § 1857h–7(b).

Plaintiffs finally contend that Senator Muskie's statements to Mr. Ruckelshaus at the latter's confirmation hearing establishes that the Administrator's duties in determining the unsatisfactoriness of a project were intended to be non-discretionary. This contention is without merit. Although the Senator used much broader language than the statute, there is no indication in his statement that the initial finding of "unsatisfactory" with regard to federal action is other than one within the discretion of the Administrator. This conclusion is supported by the text of the colloquy between Senator Muskie and Mr. Ruckelshaus with respect to subsection (b) of § 310 (Senate version):

> "Senator MUSKIE. [S]ection 310 . . . makes you a self starter *whenever you, unilaterally, see an environmental risk.* You are given the responsibility to raise the red flag.
>
> What is involved here is not an input to somebody else's decision and somebody else's statement. This is an issue to be taken by you." Nomination of William D. Ruckelshaus, Hearing before the Committee on Public Works, United States Senate, 91st Cong., 2nd Sess., p. 45 (Comm. Print 1970). [Emphasis added]

The record also reflects that there is no dispute of facts concerning the procedures followed by the Administrator in determining that the Jim Bridger FES and the federal action with respect to the Project was not "unsatisfactory."

Those facts show no arbitrary or capricious action nor any abuse of dis-

cretion. The facts show that the Administrator proceeded cautiously by first evaluating and commenting upon the "second draft" of EIS, then evaluating and approving the final EIS (FES) after expressing satisfaction that the BLM final draft had responded to the Administrator's initial reservations about the Project. (See affidavit of Thomas Sheckells and attached letters accompanying defendants' memorandum in support of motion for summary judgment.)

In summary, since the facts show that no finding of "unsatisfactory" was made by the Administrator of the EPA, and since such a finding is within the discretion of the Administrator, and since the Administrator did not act arbitrarily, capriciously or in abuse of discretion in approving the FES, summary judgment on the second claim should be entered in favor of the defendants.

### Third Claim—Significant Deterioration of Air Quality

The Clean Air Act, as amended in 1970, provides an intricate scheme for the promulgation, implementation, and enforcement of air pollution regulations. Its stated purposes include the protection and enhancement of the quality of the nation's air resources to promote the public health and welfare and the productive capacity of its population, and the encouragement and assistance in developing and implementing regional air pollution control programs. 42 U.S.C. § 1857(b). In pursuit of these purposes, the Administrator of the Environmental Protection Agency is directed to promulgate and publish national primary and secondary ambient air quality standards for certain pollutants. Primary standards are those, in the judgment of the Administrator, necessary to protect public health. Secondary standards are those, in the judgment of the Administrator, necessary to protect public welfare. 42 U.S.C. § 1857c-4. Thereafter, each state is directed to adopt and submit to the Administrator a plan for implementation, maintenance, and enforcement of the primary and secondary standards to be approved by the Administrator if the plan complies with certain statutory requirements. 42 U.S.C. § 1857c-5.

Collateral to the above enforcement scheme, private citizens' suits are authorized to further protect the environment. 42 U.S.C. § 1857h-2(a). Any person may commence a civil action in his own behalf against any person, including the United States and any governmental agency, who is allegedly in violation of any emission standard or order issued by the Administrator or State with respect to such standards. Any person may also commence a civil action on his own behalf against the Administrator for alleged failure to perform any act or duty required by the Clean Air Act.

In the third claim, plaintiffs seek to prevent significant deterioration of existing air quality which they allege will result from Jim Bridger Power Plant emissions. They allege that by virtue of the Clean Air Act, the National Environmental Policy Act (NEPA), Executive Order No. 11514, and the National Ambient Air Quality Standards, the protection and preservation of air quality from "significant deterioration" is national policy and that governmental officers may not take actions which will cause such significant deterioration. Plaintiffs allege that defendants Morton, Silcock, Rudd, and Baker, by issuing rights-of-way for the Jim Bridger Plant, have permitted significant deterioration of existing air quality in violation of NEPA and Executive Order No. 11514. Plaintiffs finally allege that they have given the required notice under 42 U.S.C. § 1857h-2(b).

It appears from plaintiffs' pleadings and their briefs on these motions, that they rely solely on § 1857h-2 for their right to private suit in this claim. Their cause of action is for violation of an emission standard, i. e., significant deterioration of existing air quality, which they assert is a requirement based upon the policy of the Act. They allege that

**1264**

the Administrator may not approve any state plans which allow pollution levels to rise to secondary standard levels, and that the defendants, in granting the rights-of-way would cause air pollution levels to rise such that significant deterioration would occur and thereby violate an emission standard.

Plaintiffs rely on Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), aff'd 4 ERC 1815 (D.C.Cir. 1972), aff'd by U. S. Supreme Court by an equally divided court, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), for the proposition that the Clean Air Act prohibits significant deterioration of air quality. In that case, the District Court for the District of Columbia held that the Administrator may not approve state implementation plans which permit pollution levels of clean air to rise to secondary standard levels because such action is contrary to the Act's policy of non-degradation of existing clean air. 344 F.Supp. 256. The District Court then issued a preliminary injunction, later made permanent, which enjoined the Administrator of the EPA from approving any state plan unless subject to later review by him to insure that it does not permit significant deterioration. The Administrator was ordered to approve any state plan which effectively prevents significant deterioration and disapprove any portion of a state plan which fails to prevent significant deterioration. Finally, the Administrator was ordered to prepare and publish proposed regulations, pursuant to 42 U.S.C. § 1857c–5(c) as to any state plan found to permit significant deterioration or to fail to take measures necessary to prevent such deterioration. (See Exhibit F, Plaintiffs' Memorandum in Support of Motion for Summary Judgment). The EPA is presently in the process of complying with the court's order.

 Assuming, arguendo, that the Clean Air Act policy prohibits the Administrator from allowing significant deterioration of clean air areas, and that a private suit against governmental officials who take actions which will cause significant deterioration is a suit "for violation of an emission standard" under 42 U.S.C. § 1857h–2(b), this suit is premature under the doctrine of primary jurisdiction. In cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L. Ed. 576 (1951). The purpose of such a doctrine is to promote uniformity of regulation and to capitalize upon the agency's expertise. United States v. R. C. A., 358 U.S. 334, 79 S.Ct. 457, 3 L. Ed.2d 354 (1959).

This doctrine controls in this case. The Administrator of the EPA is the one who must, in the first instance, set the primary and secondary ambient air standards. It is he who must approve the state implementation plans. And it is the Administrator who has been ordered to determine whether or not the state plans permit "significant deterioration." The Administrator therefore must determine what "significant deterioration" means. The Administrator has at his hands the expertise to make such determinations and has the capability of guaranteeing uniformity of regulation.

When the Administrator makes the determinations which are within his province, using the expertise of his agency, plaintiffs will then have the opportunity, if they so choose, to challenge such action.

Summary judgment of dismissal of the third claim without prejudice should forthwith enter.

For the reasons above stated, the plaintiffs' motions for summary judgment as to their second and third claims for relief, should be denied.

It is therefore ordered that the plaintiffs' motions for summary judgment on their second and third claims for relief are hereby denied.

It is further ordered that the motions for summary judgment of the Federal defendants and the intervening defendants for dismissal of the first, second and third claims for relief set forth in the complaint are granted, and summary judgment in favor of the Federal defendants and the intervening defendants for a dismissal of the complaint shall forthwith enter and said defendants shall have judgment for their costs to be taxed by the Clerk of the Court upon the filing of a bill of costs.