[S.F. No. 24459. Oct. 20, 1983.]

GENERAL TELEPHONE COMPANY OF CALIFORNIA, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
CITY OF SANTA MONICA, Real Party in Interest.

**COUNSEL**

Albert M. Hart, H. Ralph Snyder, Jr., Kenneth K. Okel, Seth Hufstedler and Hufstedler, Miller, Carlson & Beardsley for Petitioner.

Janice E. Kerr, Hector Anninos, Anne Mester and Walter H. Kessenick for Respondent.

Robert M. Myers, City Attorney, Sarah J. Shirley and Nancy Marvel, Deputy City Attorneys, for Real Party in Interest.

**OPINION**

**KAUS, J.—**

I

In March 1981 General Telephone Company of California (General) filed an application with the Public Utilities Commission (commission) seeking authority to increase certain intrastate rates and charges. The commission, in turn, issued an "Order Instituting Investigation" (OII) into various phases of General's operations, including the quality of its service.[1] Public hearings were held between April and October 1981. Evidence concerning the quality of service by General was received in the form of consumer surveys, petitions, responses to service questionnaires and public witness testimony. The hearings eventually resulted in a decision (82-04-028), later amended (82-07-117). In its decision the commission made certain findings justifying a partial grant of the rate increase sought. It also found, however, that while General had met the objectives of a previous directive, "General's service is still inadequate." The commission found that "General should replace its present practice regarding the purchase and supply of switching equipment with nonbiased competitive bid solicitation and evaluation practices." In particular it found that "General should adopt a competitive bidding procedure for its COSE [central office switching equipment] and submit such procedure for review and approval . . . ."[2] Finally, it found that a service penalty of $1.40 per line should be imposed if "trouble reports" relating to service exceeded a certain rate. Conclusions of law and "ordering paragraphs" in conformity with these findings followed. The entire order was made effective immediately.[3]

---

[1] The opening of an OII in connection with an application for a rate increase is standard procedure. It allows the commission to investigate and consider all aspects of the practices and service of the applicant.

[2] In its petition for writ of review, General explains that COSE "is a term applied to complex switching machines used by telephone companies to switch telephone calls between customers . . . . These machines have evolved over the years from an electro-mechanical technology to an electronic technology utilizing control by very complex and sophisticated computer systems." Typical switching installations in major metropolitan areas provide service for from 30,000 to 60,000 lines, cost $10 to $15 million each, and may require up to three years to engineer and install.

[3] The commission's 164-page decision is preceded by a "synopsis of decision" which contains the following pertinent paragraphs: "We conclude in this decision that General is not providing satisfactory service. We do so on the basis of customer surveys which indicate a very high incidence of certain common problems, including static, cross talk, and calls not going through. [¶] We have imposed a competitive bidding requirement on General, insofar as its selection of central office switching equipment is concerned, to prevent it from favoring GTE's manufacturing subsidiary *to the detriment of the service General provides.*" (Italics added.)

In due course General filed a petition for writ of review (Pub. Util. Code, § 1756), seeking review of the findings and orders relating to the service penalty and procurement of COSE by competitive bidding.

After the commission's opposition to General's petition had been received, we decided to ask the parties to aid us in exploring whether we had the power to issue a writ of review directed to some but not all of the orders complained of. Supplemental briefs were filed by both parties. In essence they agree that we may limit our review to specific parts of the commission order, but note that the outcome of such review may well affect other parts.[4]

With these procedural dangers in mind, we then ordered that a writ of review issue, but specified that "[t]he court will limit its consideration to the propriety of the portion of the order requiring petitioner to implement competitive bidding for the purchase of central office switching equipment [COSE] and the effect, if any, which its decision as to that issue may have on the balance of [the order under review]."

II

General provides telephone service for 330 communities in 20 California counties. General's parent, GT&E, owns Automatic Electric (AE), General's current supplier of COSE. In decision No. 92366, dated October 22, 1980, General had been ordered to file with the commission a plan for acquiring COSE using competitive bidding or, alternatively, indicate to the commission its justification for not adopting such a plan. General responded by filing a report prepared by Management Analysis Center, Inc. (MAC), purporting to explain General's unwillingness to adopt competitive bidding. As the commission saw it, the report argued that competitive bidding is appropriate for "procurement of standard fungible goods where first price is the appropriate criterion," but not for "procurement of high technology capital acquisitions." Although the report suggested that General's procurement mechanisms be formalized and a clear "audit trail" established, it argued that a "multi-step procedure" including two phases of negotiation should be adopted rather than competitive bidding. MAC further recommended that life-cycle costing techniques be employed.

The commission staff disagreed with the MAC report. A staff report—implemented by testimony—asserted that poor telephone service could, in part, be attributed to certain "company related" problems: "a. The type

---

[4]By way of example, the commission notes that General's rate of return was fixed at 12.71 percent on the assumption that the $1.40 service penalty would be in effect. If we were to annul the penalty, our ruling would necessarily affect the commission's judgment respecting the rate of return.

and condition of the switching equipment which General uses. More than 75% of the equipment is Step-by-Step (SXS), an electromechanical level of technology which is more than 80 years old. [¶] b. The inability of Automatic Electric (AE), a GTE subsidiary and equipment supplier to General, to develop modern electronic switching equipment in a timely fashion. [¶] c. The failure of General's planners to review and obtain state-of-the-art switching equipment from qualified, independent manufacturers. [¶] d. The apparent indifference of General's managers to the service problems. Management salaries do not reflect bonuses for good service or penalties for lack of it; as such, field managers are more likely to soothe customers' feelings rather than resolve the service problems. Also, with the unique corporate tie between General, GTE and AE, General's managers are not likely to jeopardize their career advancement plans by criticizing AE's equipment. [¶] e. The unwillingness of General to commit itself to adequate margins of switching equipment consistent with those followed by the telephone industry in California. [¶] f. The heavy emphasis on marketing, on the part of General, at the expense of basic service quality."

The staff report's conclusion was "that, with competitive bidding, General would have the motivation to purchase the best available and least costly switching equipment for its system, thereby rectifying a considerable number of service problems and decreasing the requirement for large amounts of construction capital."

### III

General claims that the commission exceeded its powers when it ordered the implementation of a competitive bidding procedure for COSE and that the order constitutes a denial of due process under the United States and California Constitutions. Reduced to its essence, it is General's position that its method of procuring COSE is none of the commission's business, but a management decision beyond its power to regulate—except possibly by disallowing excessive procurement costs for rate-making purposes. The commission, on the other hand, views General's method of procurement of COSE as one of the basic reasons for substandard service, as well as being financially wasteful.[5]

In addition to championing its MAC report, General argued that no other major United States telephone company uses competitive bidding for COSE and that competitive bidding would be impractical because it could lead to a proliferation of different types of switching devices within the company,

---

[5] The staff estimated that General's insistence on AE switching equipment at just one office cost the subscribers $1.2 million.

thereby increasing maintenance costs. However, staff witnesses pointed to numerous smaller companies that use competitive bidding and employ switching devices from different companies with satisfactory results.

The commission generally adopted the recommendations of the staff ordering: (1) that General submit a competitive bidding plan within 60 days of the effective date of the order, (2) that the plan be implemented 30 days after commission approval, and (3) that the cost of COSE produced by AE put on line more than three years from the effective date of the order would be disallowed for ratemaking purposes unless the COSE was selected by competitive bidding. To alleviate General's concerns regarding a proliferation of different kinds of COSE, the commission modified the staff recommendation, permitting General to receive bids for COSE in lots of five or more switches rather than single switches.[6]

## IV

General's primary challenge to the commission's order is that it acted in excess of its jurisdiction. The commission relies on Public Utilities Code sections 728, 761 and 762 which, it asserts, authorize it to issue such an order. The relevant portions of these provisions are set out in the margin.[7] The commission also points to section 701, which grants it authority

---

[6]After we granted review, General filed a competitive bidding plan that has been approved by the commission. The plan was filed pursuant to the commission's order, which required that it be submitted within 60 days. General informs us that it was filed under protest and with the express condition that it did not constitute a waiver of its claims regarding the commission's jurisdiction. Nevertheless, the plan appears to contain much of the flexibility that General complains is lacking in competitive bidding. Thus, for example, the plan states: "In its evaluation of bids, [General] shall perform a product life cycle analysis. This analysis will include not only consideration of purchase price *but all other costs and requirements* associated with the use of particular products or equipment over their operational life." The plan also permits General to look at the financial stability, performance capability, and business reputation of manufacturers and reserves to General the right to reject "any or all bids . . . ." The plan further establishes an assessment group responsible for performing technical and economic analyses of products, as well as their compliance with bid requirements.

[7]Section 728: "Whenever the commission, after a hearing, finds that the rates or classifications, demanded, observed, charged, or collected by any public utility for or in connection with any service, product, or commodity, or the rules, practices, or contracts affecting such rates or classifications are insufficient, unlawful, unjust, unreasonable, discriminatory, or preferential, the commission shall determine and fix, by order, the just, reasonable, or sufficient rates, classifications, rules, practices, or contracts to be thereafter observed and in force."

Section 761: "Whenever the commission, after a hearing, finds that the rules, practices, equipment, appliances, facilities, or service of any public utility, or the methods of manufacture, distribution, transmission, storage, or supply employed by it, are unjust, unreasonable, unsafe, improper, inadequate, or insufficient, the commission shall determine and, by order or rule, fix the rules, practices, equipment, appliances, facilities, service, or methods to be observed, furnished, constructed, enforced, or employed. The commission shall pre-

to "do all things, whether specifically designated in [the code] or in addition thereto, which are necessary and convenient" to the exercise of its powers to supervise and regulate public utilities.

While, on their face, these provisions seem more than adequate to support the commission's action, language in *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441] (*Pac. Tel.*), upon which General relies, casts some doubt on the matter.[8]

In *Pac. Tel.*, the commission found that fees paid by the Pacific Telephone and Telegraph Company to its parent, American Telephone and Telegraph Company, were excessive. To redress the problem, the commission ordered Pacific to pay American no more than the reasonable cost incurred in the rendition of its services to Pacific or their reasonable value, whichever was less. The commission also established a maximum payment: in no event was Pacific to pay American more than $2,250,000 annually without seeking advance authorization from the commission.

Notwithstanding the commission's assertion that its actions were justified by two of the same sections cited in support of the instant order,[9] the court—

---

scribe rules for the performance of any service or the furnishing of any commodity of the character furnished or supplied by any public utility, and, on proper demand and tender of rates, such public utility shall furnish such commodity or render such service within the time and upon the conditions provided in such rules."

Section 762: "Whenever the commission, after a hearing, finds that additions, extensions, repairs, or improvements to, or changes in, the existing plant, equipment, apparatus, facilities, or other physical property of any public utility or of any two or more public utilities ought reasonably to be made, or that new structures should be erected, to promote the security or convenience of its employees or the public, or in any other way to secure adequate service or facilities, the commission shall make and serve an order directing that such additions, extensions, repairs, improvements, or changes be made or such structures be erected in the manner and within the time specified in the order. If the commission orders the erection of a new structure, it may also fix the site thereof."

All statutory references herein are to the Public Utilities Code.

[8]General also argues that the commission is barred from requiring competitive bidding for privately owned public utilities because such utilities were not included in statutory requirements of competitive bidding imposed on government operated utilities. (See §§ 16501, 16502, 16506 (public utility districts); § 21638 (airports); §§ 28990-28992 (BART).) But, except for safety regulation of BART (§ 29047; see *Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863 [31 Cal.Rptr. 463, 382 P.2d 583]), the commission does not regulate those government entities, and thus, the Legislature may well have determined that specific statutory competitive bidding requirements were necessary to provide appropriate restraints on those utilities. In light of the commission's existing broad statutory powers with respect to privately owned utilities, no similar particularized legislative enactment was needed to authorize the commission's imposition of competitive bidding requirements on private utilities. The statutes relied on by General do express, however, a clear legislative policy favoring competitive bidding as a method of regulation.

[9]The commission relied on sections 32 and 35. Although the language has been changed slightly, these sections were incorporated in sections 728 and 761 respectively.

over a number of dissents—found that the commission had exceeded its jurisdiction. The majority recognized that the commission had *"broad powers to regulate the relationship of the utility to the consumer*; thus it can determine the services that must be provided by the utility and the rates therefor."* (At p. 827.) Moreover, we observed that "commissions have power to prevent a utility from passing on to ratepayers unreasonable costs of materials and services." (At p. 826.) However, we found that "[T]he act does not . . . specifically grant the commission power to regulate contracts by which the utility secures the labor, materials, and services necessary to conduct its business. . . ." (At p. 827.) Further, the *Pac. Tel.* court refused to imply these powers under the ratemaking authority, noting that "[a]lmost every contract a utility makes is bound to affect rates and services," and that "[t]he determination of what is reasonable in conducting the business of the utility is the primary responsibility of management." (At p. 828.) The court also rejected the argument that the commission has greater powers in dealing with contracts between affiliates because the "safeguards provided by arms-length bargaining are absent" (at p. 826), explaining that the relationship between operating telephone companies and parents was legally sanctioned, and, therefore, contracts between those companies could not be distinguished from other contracts.

Later cases, however, have cast serious doubt on the continuing vitality of much of the reasoning in *Pac. Tel.* The *Pac. Tel.* court's primary justification for refusing to imply the commission's power to regulate the arrangement between Pacific and American was the "invasion of management" rationale. (See generally, Note, *Management Invaded—A Real or False Defense?* (1952) 5 Stan.L.Rev. 110.) Nevertheless, only a few years later, we severely limited the "invasion of management" argument in *Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354 [260 P.2d 70]. In that case, we affirmed a commission order requiring Southern Pacific to furnish a particular type of passenger service, even specifying the particular equipment to be used, despite Southern Pacific's Company claim that the order was an invasion of management. The majority opinion, written by one of the dissenters in *Pac. Tel.*, but signed by its author, responded to the "invasion" argument without a single mention of *Pac. Tel.*: "In exercising the powers . . . granted [by the Legislature] it may not be disputed that the commission to some extent invades the functions of management. But they are not necessarily unlawfully invaded. They are subjected to the exercise of the police power of the state in the regulation of the public utility. It is undoubtedly true that for the most part all lawful regulations of a public utility in the exercise of the police power are to some degree an invasion of the managerial functions of the utility . . . . Without question the order of substitution of one equipment for another by a transportation company is within the field of management; but it does not follow that as

such it is necessarily outside of the field of an appropriate regulatory order." (At pp. 367-368.) The *Southern Pacific* court then recounted at length what it termed "the most conspicuous example of an asserted but rejected claim of 'invasion of management . . .'"—the commission's order requiring the construction of a passenger station and terminal in Los Angeles described by this court in *Atchison, etc., Ry. Co.* v. *Railroad Com.* (1931) 209 Cal. 460 [288 P. 775]. In that case, the commission not only ordered the construction and specified the amount to be spent, but provided plans for the station. The commission's order was affirmed by this court and later by the United States Supreme Court. (*Atchison, T. & S.F. Ry. Co.* v. *Railroad Com. of Calif.* (1931) 283 U.S. 380 [75 L.Ed. 1128, 51 S.Ct. 553].)[10]

As the "invasion of management" rationale has waned, we have been more willing to permit regulatory bodies to exercise powers not expressly stated in their mandate. ■ Thus, in *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 176 [70 Cal.Rptr. 407, 444 P.2d 79], we stated that "In determining whether a specific administrative rule falls within the coverage of the delegated power, the sole function of this court is to decide whether the department reasonably interpreted the legislative mandate." ■ And recently, in *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347 [185 Cal.Rptr. 453, 650 P.2d 328], we noted: "'[T]he absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean such a regulation exceeds statutory authority . . . . [Citations.]'" (At p. 362.)

*Pac. Tel.* also came under attack in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592] where, among other things, we held that plaintiffs' allegations of arbitrary employment discrimination against homosexuals stated a cause of action against the utility under section 453, subdivision (a) of the Public Utilities

---

[10]*Atchison* and *Southern Pacific* can, of course, be distinguished from *Pac. Tel.* in that they deal directly with the commission's power over service. The point here is simply that the "invasion of management" rationale now appears to be disfavored. We have been unable to locate a single case since *Pac. Tel.* in which this court has annulled a commission order based on this rationale.

It is interesting to note that almost 20 years ago the commission concluded that it had the power to issue a general order requiring all regulated utilities to employ competitive bidding techniques. ((1964) 62 Cal.P.U.C. 580.) In its opinion the commission reasoned: "The holding of the court in [*Pac. Tel.*] must be interpreted in light of the subject matter there involved. Much of the language of that decision is *dicta*. Later decisions of the Supreme Court of California are clearly at variance with the broad, general *dicta* contained in the Telephone case." (At p. 582.) The commission went on to quote *Southern Pacific, supra,* 41 Cal.2d 354, at length. After determining that it had the power to require competitive bidding, however, the commission decided that it would not necessarily benefit customers, and therefore, that a general requirement of competitive bidding was not warranted at that time.

Code. Rejecting the telephone company's contention that *Pac. Tel.* barred courts and the commission from dealing with discriminatory hiring practices pursuant to the provisions of the Public Utilities Code, we suggested that *Pac. Tel.* does not prohibit intervention in a private utility's hiring practices ·when "statutory policies are *implicated.*" (Italics added.) This, despite language in *Pac. Tel.* suggesting that in the absence of statutory authorization, "it would hardly be contended that the commission has power to formulate the labor policies of utilities . . . ." (At p. 829.)[11]

Finally, the *Pac. Tel.* court's observations regarding the commission's powers to control the relationship between utilities and their parents or affiliates have succumbed to regulatory realism. As noted, the *Pac. Tel.* opinion suggests that there is "no public policy against affiliated corporations" (34 Cal.2d at p. 832) and therefore, the commission may not treat contracts between operating companies and their affiliates differently from other contracts. However, for many years, the commission has refused to recognize the distinction between operating companies and their affiliates or parents and has looked directly to the profits of the parent on "sales" to affiliates when assessing the proper rate base. We approved of this practice in *Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 659-662 [44 Cal.Rptr. 1, 401 P.2d 353] and *City of Los Angeles v. Public Utilities Commission* (1972) 7 Cal.3d 331, 344 [102 Cal.Rptr. 313, 497 P.2d 785]. In the latter case we noted: "[T]he utility enterprise must be viewed as a whole without regard to the separate corporate entities . . . ." (At p. 344.) Similar logic was applied to the relationship between General and AE in commission Decision No. 75873 (1969) 69 Cal.P.U.C. 601, 634-639, where the commission concluded: "We find that General and Automatic, both wholly owned subsidiaries of GT&E, are, in effect, different departments of one business enterprise, so there exists no incentive to real bargaining. . . ." (At p. 639.)

While these developments cast some doubt on the continued vitality of *Pac. Tel.,* for current purposes it suffices that the decision is easily distinguishable.

---

[11]Enroute to our conclusion in *Gay Law Students,* we also noted: "[T]he nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation. Both the prices which a utility charges for its products or services and the standards which govern its facilities and services are established by the state (Pub. Util. Code, §§ 728, 761); in addition, the state determines the system and form of the accounts and records which a public utility maintains and it exercises special scrutiny over a utility's issuance of stocks and bonds. (*Id.,* §§ 792, 816.) Finally, the state had endowed many public utilities, like PT&T, with considerable powers generally enjoyed only by governmental entities, most notably the power of eminent domain. (*Id.,* §§ 610-624.) *Under these circumstances, we believe that the state cannot avoid responsibility for a utility's systematic business practices and that a public utility may not properly claim prerogatives of 'private autonomy' that may possibly attach to a purely private business enterprise.*" (At pp. 469-470; italics added.)

First, the commission's attempt in *Pac. Tel.* to dictate the terms of a contract between the utility and its parent was a typical instance of unnecessary intermeddling. As the opinion stressed, precisely the same result—from the public's point of view—could have been attained by disallowing excessive costs for ratemaking purposes. No equally simple solution is possible here, where the commission, for more than adequate reasons, has concluded that the reasonable cost of certain equipment can only be ascertained through the competitive bidding process—precisely what General resists.

Second, as we demonstrated at the outset, the commission's insistence on competitive bidding procedures for COSE was primarily motivated by (1) its desire to improve the service General rendered its subscribers, and (2) its conclusion that only through competitive bidding could General be pried away from its dependence on the antiquated equipment being manufactured by AE, its affiliate. In *Pac. Tel.*, by contrast, there was not the slightest suggestion that by following the commission orders disapproved by this court, Pacific's subscribers would have been furnished better service.

Third, *Pac. Tel.* itself stressed: "The commission has been given broad powers to regulate the *relationship of the utility to the customer*; thus it can determine the services that must be provided by the utility and the rates therefor. It has also been given certain specific powers *to regulate the manner in which the utility provides the required services* to safeguard the utility's ability to serve the public efficiently at reasonable rates. . . ." (34 Cal.2d at p. 827, italics added.) The contracts in *Pac. Tel.* which were so offensive to the commission had nothing to do with the "relationship of the utility to the customer," nor did they affect "the manner in which the utility provide[d] the affected services." As our holding in *Southern Pacific, supra,* demonstrates, the "management invaded" pejorative has little application in the area of "direct consumer-utility contact." (See Note, *Management Invaded—A Real or False Defense?, supra,* 5 Stan.L.Rev. at pp. 119-124.)

 In sum, since the major purpose of the order concerning competitive bidding for COSE was better service for the consumer, rather than an officious desire to run General's business, *Pac. Tel.* is not applicable. With that legal roadblock out of the way, the basic powers of the commission, contained, inter alia, in sections 701, 728 and 761 are ample to sustain the challenged order.

## V

General finally claims that the commission's order deprived it of due process insofar as it arbitrarily provides that after three years from its ef-

fective date the cost of AE manufactured COSE shall be disallowed for ratemaking purposes "unless it can be shown that the selection of the equipment resulted from valid competitive bids." General claims that, at the risk of not being permitted a return on its investment, this part of the order prohibits it from buying AE equipment even for the best of economic, financial or technical reasons.

General is fighting the battle it just lost. For adequate reasons the commission determined that the most efficient equipment would be obtained through competitive bidding. If that process results in General acquiring AE equipment, nothing will be disallowed. The record shows that the purpose of the disallowance is to prevent General from frustrating the competitive bidding procedure by "contracting out to AE all of its COSE requirement well into the future . . . ." We see nothing objectionable in such a prophylactic approach.

## VI

Since we affirm that part of the order which we agreed to review, we have no occasion to consider the effect of our decision on other portions of decisions Nos. 82-04-028 and 82-07-117.

The order is affirmed.

Bird, C. J., Mosk, J., Richardson, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.