[No. A020363. First Dist., Div. Two. Oct. 21, 1986.]

BARNETT STEPAK, Plaintiff and Appellant, v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY et al.,
Defendants and Respondents.

**COUNSEL**

David B. Flinn, Steven B. Mains, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, Stanley Nemser, Michael P. Fuchs, Wolf, Popper, Ross, Wolf & Jones and Harvey Greenfield for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Robert M. Westberg, Richard W. Odgers, James B. Young, Kevin M. Fong, Robert V. R. Dalenberg, Paul H. White, Gerald H. Genard and Steven D. Rathfon for Defendants and Respondents.

## OPINION

**SMITH, J.**—We will hold that Public Utilities Commission (commission) approval of a proposed merger between an American Telephone and Telegraph Company (AT&T) subsidiary and Pacific Telephone and Telegraph Company (PT&T) did not divest the superior court of jurisdiction to entertain a class action suit brought against the utilities by minority shareholders of PT&T, even though the commission, in approving the merger, made findings that the proposed transaction was fair to minority shareholders. We will further hold that the commission's findings do not create a res judicata or collateral estoppel bar to litigating those issues in the class action. Accordingly, we reverse a judgment dismissing the class action suit of appellant Barnett Stepak.

### BACKGROUND

At all times relevant to this case, AT&T, a New York corporation, was the parent company of the Bell System. PT&T, a California corporation and utility subject to commission jurisdiction, was a member of the Bell System. Prior to the proposed merger, AT&T owned over 90 percent of the voting shares of PT&T. That ownership consisted of over 91 percent of PT&T's common shares and 78 percent of its voting preferred shares; the remaining shares were publicly owned. Appellant Stepak, a New Jersey resident, owned some of the roughly 19 million outstanding shares of PT&T common stock.

In November 1981, PT&T applied to the commission for approval of a plan which would eliminate all PT&T minority voting power through a merger of PT&T with Pacific Transition Corporation (PTC), a wholly owned subsidiary of AT&T created (as a California corporation) especially for the merger. Under an agreement requiring majority approval by all holders of PT&T's common and preferred voting shares, PTC would merge with PT&T, the surviving corporation, with minority common shareholders receiving .35 shares of AT&T common stock for every share of PT&T common stock; AT&T would buy out all voting preferred shares at $60 per share.[1] The net effect of the merger would be to place complete voting control with AT&T.

The commission initially heard the matter on December 23 and 24, 1981, and the matter stood conditionally submitted. Then, in early January 1982, AT&T and the United States Department of Justice announced that they

---

[1]PT&T's *non*voting preferred shares would remain outstanding and unaffected by the merger.

had reached settlement in ongoing civil antitrust litigation in federal court. A consent decree entered later that month called for divestiture of AT&T. (*United States* v. *American Tel. and Tel. Co.* (D.D.C. 1982) 552 F.Supp. 131, 226 [modifying the consent decree], affd. (1983) 460 U.S. 1001 [75 L.Ed.2d 472, 103 S.Ct. 1240].)

In light of the pending divestiture, the commission reopened the proceedings and ordered PT&T to file briefing on the effect of the federal court action on the application. The commission asked in particular for an analysis of "whether the continued existence of minority shareholders better ensures protection of the interests of both PT&T and its ratepayers" and "whether the settlement will adversely affect the rights and privileges of minority PT&T shareholders." PT&T filed its response, and the commission ordered a further hearing, to start February 22.

Meanwhile, appellant, who had not had notice of the commission proceedings, learned of them through a notice and proxy statement distributed to PT&T shareholders for a special shareholders' meeting, set for February 26, at which the merger agreement would be voted on.

The hearing resumed, as scheduled, on February 22. Appellant appeared and participated thereafter, through counsel, as an interested party. The matter was resubmitted subject to further briefing. Before the close of the hearing on March 1, PT&T's shareholders had approved the merger agreement.[2]

Appellant filed a posthearing brief in which he argued that the merger was not in the best interests of PT&T, its customers or its minority stockholders in that there was no legitimate corporate purpose for the merger, potential regulatory and tax changes had created uncertainty, PT&T's directors had a conflict of interest,[3] and the directors had not acquired sufficient knowledge of the divestiture and subsequent restructuring to make an informed decision. He argued that the interests of consumers and minority shareholders coincided and also that, for a number of reasons, the merger would be unfair to minority shareholders.

On the same day as the commission hearing resumed, appellant filed the instant action, on behalf of himself and all other minority holders of PT&T common stock, against AT&T, PTC, and PT&T and its directors. The

[2]Of the 63.40 percent of minority common shares voted, 97.39 percent approved, 1.50 percent disapproved and 1.11 percent abstained.

[3]The asserted conflict of interest stems in part from the directors' personal ownership of relatively small amounts of PT&T common stock as compared to AT&T stock.

complaint, framed in a single cause of action, alleges conflicts of interest and breaches of fiduciary duties in the form of overreaching, unfair dealing and nondisclosure. Particular allegations are that there was no legitimate purpose for the merger, that PT&T's directors failed to disclose that an initial proposed exchange ratio of .305 shares of AT&T stock per PT&T share was found to be unfair by a firm PT&T's directors had consulted, that the exchange ratio now being offered was unfair or "grossly unfair," and that AT&T (as majority owner of PT&T common stock) improperly diluted the class's shares and increased its own percentage of common stock ownership through two stock offerings just prior to the merger. The prayer asks for declaratory relief and injunction against the merger agreement or, should the merger agreement be consummated, equitable relief (including rescission) and damages.

The commission issued its decision ((1982) 9 Cal.P.U.C.2d 101) on May 4, 1982. Exercising jurisdiction under Public Utilities Code sections 854 and 818,[4] the commission approved the merger. On the subject of PT&T's minority shareholders, the commission concluded with "great reluctance" that, although the minority's interests could parallel those of ratepayers, particularly during eventual divestiture of PT&T from AT&T, the circumstances as a whole did not warrant retaining their influence. (*Id.*, at pp. 122-123, 129.)

As an independent factor bearing on whether the merger might prove "adverse to the public interest," the commission considered whether the merger was "fair to minority shareholders."[5] After reviewing arguments of appellant and the commission's own staff (whose brief supported appellant's position), the commission concluded: "These [arguments], if valid, tend to

---

[4]All undesignated section references in this opinion are to the Public Utilities Code.

Section 854 provides: "No person or corporation, whether or not organized under the laws of this state, shall, after the effective date of this section, acquire or control either directly or indirectly any public utility organized and doing business in this state without first securing authorization to do so from the commission. Any such acquisition or control without such prior authorization shall be void and of no effect. . . ."

Section 818 requires commission authorization before a utility may issue stock. (See fn. 9, *post.*) Under the terms of the proposed merger, all outstanding shares of common and preferred voting stock would be cancelled and replaced by a single share of PT&T common stock.

[5]After analyzing potential benefits of the merger, the commission stated: "Given these conclusions, we must determine whether any aspect of this merger is adverse to the public interest, which would outweigh the benefits described above and lead us to disapprove or condition part or all of the application. In this regard, three major issues have arisen in the course of the proceedings:

"1. Whether the merger will affect PT&T's behavior in future transactions with AT&T.

"2. Whether the merger will increase rates due to higher rate of return requirements or any other reason.

"3. Whether the merger is fair to minority shareholders." (9 Cal.P.U.C.2d 101, 120.)

show that a higher price for publicly held common shares could be substantiated. However, the exchange offer is not so low as to be unfair to the minority shareholders. In our view there is a range of reasonableness in measuring the fairness of the exchange offer, within which the exchange offer falls. PT&T's outside directors acted reasonably in relying upon Dillon Read's fairness opinion[6] and the data supplied in its support. Based on the analyses supplied in the Dillon Read report, the exchange offer is fair, although it may not produce the dollars desired by some of the minority shareholders." (*Id.*, at pp. 125-126.)

The commission's formal findings included these: "[t]he proposed merger is for legitimate corporate purposes"; "[t]he Dillon Read report and fairness letter provide a competent basis for testing the reasonableness of the exchange offer"; "[t]he exchange offer is fair and reasonable"; "[t]he interests of minority shareholders will not be adversely affected by approval of the merger"; "[d]isapproval of the merger would deny minority shareholders tangible benefits . . . ." (*Id.*, at pp. 128-129.) The commission also made formal conclusions of law that the merger was "for legitimate corporate purposes" and would not "adversely affect minority shareholders." (*Id.*, at p. 129.)

The commission decision became final—no petition for reconsideration or petition for Supreme Court review having been filed—and the merger was consummated. Class action defendants (respondents herein) then filed a supplemental answer in which they asserted, as affirmative defenses, that (1) the commission's decision acted as a res judicata and collateral estoppel bar (§ 1709), and (2) the court lacked jurisdiction of the subject matter (§ 1759).

Respondents raised the same two arguments in support of a motion to dismiss. The motion was granted, and this appeal from the judgment of dismissal followed.

APPEAL

I

■ We first address the question of jurisdiction, which depends in part on the interrelation of two provisions of the Public Utilities Code. Section 1759, relied on by respondents, deprives the superior court of jurisdiction to "reverse, correct, or annul" any order or decision of the commission or to "enjoin, restrain or interfere with" the commission's performance of its

---

6"Dillon Read" refers to PT&T's financial consultant, Dillon, Read & Co., Inc.

official duties.[7] Section 2106, relied on by appellant, vests the superior court with jurisdiction to award damages—including exemplary damages in a proper case—against any public utility that acts unlawfully or fails to act as required by law.[8] "[I]n order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (*Waters* v. *Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161].)

In the *Waters* case, the plaintiff sought damages for the utility's alleged failure to furnish adequate telephone service as required by statute (§ 451), and the Supreme Court upheld a partial summary judgment limiting recovery to a credit allowance. (*Waters* v. *Pacific Telephone Co., supra,* 12 Cal.3d 1, 4-6.) The court reasoned: "[T]he commission has approved a general policy of limiting the liability of telephone utilities for ordinary negligence to a specified credit allowance, and has relied upon the validity and effect of that policy in exercising its rate-making functions. . . . [T]o entertain suits such as plaintiff's action herein and authorize a substantial recovery from Pacific would thwart the foregoing policy. That being so, the express language of section 1759 . . . bars plaintiff's action." (*Id.,* at p. 10.)

Our case is distinguishable from *Waters* and other cases where the subject of the superior court action is addressed by commission regulation. (See, e.g., *Dollar-A-Day Rent-A-Car Systems, Inc.* v. *Pacific Tel. & Tel. Co.* (1972) 26 Cal.App.3d 454, 458-462 [102 Cal.Rptr. 651] [reasonableness of utility's regulation of telephone directory advertising]; *Vila* v. *Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 470, 474-476, 479 [43 Cal.Rptr. 654] [failure to provide water service]; cf. *Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 6-8 [135 Cal.Rptr. 170] [adequacy of gas equipment maintenance].) We are aware of no "de-

---

[7]Section 1759 provides: "No court of this State, except the Supreme Court to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, except that the writ of mandamus shall lie from the Supreme Court to the commission in all proper cases."

[8]Section 2106 provides in part: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

clared supervisory and regulatory policies" (*Waters* v. *Pacific Telephone Co., supra,* 12 Cal.3d 1, 4) ever formulated or relied on by the commission on the subject of safeguarding minority investor interests. Applying the *Waters* test of jurisdiction, we cannot conceive of how the superior court's award of damages or other relief to wronged minority shareholders would "hinder or frustrate" (*ibid.*) declared commission policy. Appellant's class action suit is therefore authorized under section 2106.

## II

We are further persuaded on the question of jurisdiction that the commission entered an area beyond its regulatory realm when it purported to adjudicate the "fairness" of the transaction to minority shareholders, as distinct from the issue of whether retention of minority shareholders was in the public interest.

The matter is all but settled by the Supreme Court's decision in *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441] (*Pac. Tel.*), which concerned a services contract between AT&T and PT&T (referred to in the opinion as American and Pacific). American dominated Pacific through stock ownership. The commission, finding that a fixed percentage of gross receipts paid by Pacific under the contract was an arbitrary exaction, ordered that the contract could continue only on certain price terms prescribed by the commission. (*Id.,* at p. 824.) The issue on review was whether the commission had jurisdiction to prescribe the contract terms (*id.,* at pp. 825-826). The Supreme Court, in a five-member majority opinion authored by Justice Traynor, held that it did not.

The court began with this summary of the commission's regulatory powers. "The primary purpose of the Public Utilities Act . . . is to insure the public adequate service at reasonable rates without discrimination. . . . The act grants to the commission broad regulatory powers, which may conveniently be divided into two classes. The commission has been given broad powers to regulate the relationship of the utility to the consumer; thus it can determine the services that must be provided by the utility and the rates therefor. It has also been given certain specific powers to regulate the manner in which the utility provides the required services to safeguard the utility's ability to serve the public efficiently at reasonable rates; thus the commission must approve the sale or encumbrance of operative property necessary or useful to the utility in the performance of its duties . . ., and it must approve the issue of securities and may specify the manner in which funds so raised may be spent. . . ." (*Pac. Tel., supra,* 34 Cal.2d at pp. 826-827, citations omitted.)

The court found no specific or implied grant of power to prescribe contract terms. Of particular interest to our case is the court's rejection of former section 52 (now § 818, one of the bases for the commission's jurisdiction in our case).[9] The commission had contended that, "by approval of the securities that Pacific issues, it provide[d] Pacific with a defense to any action a shareholder might bring to prevent abuse of his interest by the management, and that therefore it must have the power to protect minority shareholders from abuses arising out of contracts made with the majority shareholder, American." (*Pac. Tel., supra,* 34 Cal.2d 822, 827.) The Supreme Court responded, "There is nothing in section 52, however, to indicate that commission approval of securities issues operates to deprive minority shareholders of remedies they would otherwise have." (*Ibid.*)

The *Pac. Tel.* court required an express or implied legislative grant of power before the commission would be allowed to set the terms of service contracts between the affiliate corporations even though, as the court acknowledged, such contracts might generally be expected to affect rates and services of the utility—and hence to affect the public interest which the commission was charged with protecting. "Almost every contract a utility makes is bound to affect its rates and services." (*Pac. Tel., supra,* 34 Cal.2d 822, 828.) The court ultimately found that generalized connection to rates and services too attenuated to justify implying the statutory power that the commission claimed.

The court bolstered its result by relying in part on the so-called "invasion of management" rationale, explaining: "Moreover, the question whether a contract or practice is reasonable is one on which, except in clear cases, there is bound to be conflicting evidence and considerable leeway for conflicting opinions. The determination of what is reasonable in conducting the business of the utility is the primary responsibility of management. If the commission is empowered to prescribe the terms of contracts and the practices of utilities and thus substitute its judgment as to what is reasonable for that of the management, it is empowered to undertake the management of all utilities subject to its jurisdiction. It has been repeatedly held, however, that the commission does not have such power." (*Pac. Tel., supra,* 34 Cal.2d 822, 828.)

---

[9]Section 818 provides: "No public utility may issue stocks and stock certificates, or other evidence of interest or ownership, or bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date thereof unless, in addition to other requirements of law it shall first have secured from the Commission an order authorizing the issue, stating the amount thereof and the purposes to which the issue or the proceeds thereof are to be applied, and that, in the opinion of the Commission, the money, property or labor to be procured or paid for by the issue is reasonably required for the purposes specified in the order, and that, except as otherwise permitted in the order . . . such purposes are not, in whole or in part, reasonably chargeable to operating expenses or to income."

Did the commission in the instant case act under an express or implied grant of power to adjudicate the fairness of the merger transaction to the forced-out minority shareholders? The commission concluded, without explanation, that the fairness issue was germane to its inquiry whether the merger was in the public interest[10] and treated that issue as distinct from the question of whether retention of the minority shareholders (i.e., buying them out at *any* price) was in the public interest. (See fn. 5, *ante.*)

The commission did not rely on any express grant of authority but exercised jurisdiction on the bases of sections 818 and 854. Does either section imply authority over the fairness-to-minority-shareholders issue?

The discussion in the *Pac. Tel.* case, set out above, establishes that section 818, governing approval of stock issues (see fn. 9, *ante*), does not imply jurisdiction over fairness to minority shareholders. Commission approval of securities does not provide the utility with "a defense to any action a shareholder might bring to prevent abuse of his interest by the management, . . ." (*Pac. Tel., supra,* 34 Cal.2d 822, 827.) If that is true with respect to management abuses of contract terms, we see no reason why it should not be true as well with respect to management abuses in setting the terms of an agreement to, in effect, buy out minority shareholders.

Nor does section 854 imply jurisdiction to protect minority shareholder interests. That section merely states that prior authorization by the commission is needed before obtaining acquisition or control of a utility (see fn. 4, *ante*). Respondents have not attempted to argue that such approval connotes the jurisdiction at issue here. (Cf. *United States* v. *R. C. A.* (1959) 358 U.S. 334, 338, 346-351 [3 L.Ed.2d 354, 358-359, 362-366, 79 S.Ct. 457] [FCC approval of an exchange of television stations as being in the public interest did not, under the primary jurisdiction doctrine, insulate the owners/broadcasting companies from civil antitrust action, though the FCC had decided all issues relative to the antitrust proceedings in approving the exchange].)

We discern no express grant of power and no basis for implying a grant of power to decide the fairness issue. Sections 818 and 854 being the sole bases for the commission's assumption of jurisdiction, we must conclude that the commission exceeded its jurisdiction.

---

[10]That view appears to be directly at odds with the view of the commission's predecessor, the Railroad Commission, whose decisions indicate that scrutinizing transactions between shareholders is beyond the scope of the public interest inquiry. (*In re Western Pacific Railroad Co.* (1917) 12 C.R.C. 624, 625; cf. *In re United Railroads of San Francisco* (1921) 20 C.R.C. 166, 166-167; *In re Pacific Gas & Electric Co.* (1915) 6 C.R.C. 926, 928.)

We recognize that *Pac. Tel.*'s "invasion of management" rationale for refusing to imply commission power has been limited, most recently in *General Telephone Co.* v. *Public Utilities Com.* (1983) 34 Cal.3d 817 [195 Cal.Rptr. 695, 670 P.2d 349] (*General Telephone*). The utility in *General Telephone,* for example, challenged the commission's power to order it to implement competitive bidding procedures to procure certain switching equipment. The commission made the order upon determining that the utility's then current procurement practice, which favored purchase of outmoded equipment from a particular subsidiary of its parent corporation, was a cause of substandard telephone service and was financially wasteful. (*Id.,* at pp. 819-821.) The Supreme Court, finding ample support for the order implied in various Public Utilities Code provisions (*id.,* at pp. 822-823 & fn. 7, 827), rejected the utility's argument, based on *Pac. Tel.,* that the method of procuring the switching equipment was a management decision beyond the commission's power to regulate (p. 821). Tracing an erosion of the "invasion of management" rationale through several of its post-*Pac. Tel.* decisions (*id.,* at pp. 824-826; see especially *Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354, 367-368 [260 P.2d 70]), the court expressed "some doubt on the continued vitality of *Pac. Tel.,*" but, at any rate, found the case before it easily distinguishable. (*General Telephone, supra,* at p. 826.)

The commission's attempt to dictate the terms of the contract between the utility and its parent in *Pac. Tel.,* the court noted, constituted "a typical instance of unnecessary intermeddling" under the circumstances, and had nothing to do with the commission's broad statutory powers (as defined in *Pac. Tel.* itself) to regulate the relationship of the utility to the consumer or the manner in which the utility provided services. (*General Telephone, supra,* 34 Cal.3d 817, 827.) By contrast, the order for competitive bidding in *General Telephone* was needed to ascertain the reasonable costs of the switching equipment, and was intended to both improve service to subscribers and pry the utility away from its dependence on antiquated equipment supplied by the utility's affiliate. (*Ibid.*) Stating that "the 'management invaded' pejorative has little application in the area of 'direct consumer-utility contact'" (*ibid.*), the court concluded: "[S]ince the major purpose of the order concerning competitive bidding . . . was better service for the consumer, rather than an officious desire to run General's business, *Pac. Tel.* is not applicable." (*Ibid.*)

Erosion of the "invasion of management" rationale does not lessen the impact of *Pac. Tel.* as precedent in the instant case. As the Supreme Court's retrospect analysis in *General Telephone* shows, the crucial flaw of the commission's order in *Pac. Tel.,* notwithstanding considerations of management autonomy, was that it lacked any demonstrated connection to fur-

nishing the utility's subscribers better service or to any other aspect of the consumer-utility relationship. The order amounted to "unnecessary intermeddling." (*General Telephone, supra,* 34 Cal.3d 817, 827.) The record in *Pac. Tel.* contained no showing of how the commission's control of the contract terms would affect consumer rates and services.[11] Justice Traynor's general observation that "[a]lmost every contract a utility makes is bound to affect its rates and services" (*Pac. Tel., supra,* 34 Cal.2d 822, 828) was not enough.

In the case before us, the connection is even more speculative. As in *Pac. Tel.,* the record holds no suggestion of how unfairness in the buyout exchange ratio for minority shareholders could affect rates or services. Unlike the *Pac. Tel.* court, however, we cannot even generalize that an unfair buyout is "bound to affect" rates and services. In fact, the commission in this case expressly concluded that, except in one respect not material to the fairness issue, the merger would *not* have any direct effect on the terms, conditions or cost of service provided to California ratepayers.[12]

Finally, the "invasion of management" rationale, while near terminal "in the area of 'direct consumer-utility contact'" (*General Telephone, supra,* 34 Cal.3d 817, 827, citing Note, *"Management Invaded"—A Real or False Defense?* (1952) 5 Stan.L.Rev. 110, 119-124), has life in areas *other than* direct consumer-utility contact. The commission's conclusion that fairness to the disappearing minority interests would have no effect on rates or services clearly removes this case from those involving direct consumer-utility contact. Therefore, the "invasion of management" rationale applies.

We emphasize that the commission's consideration of whether to retain minority shareholders as a voting voice was patently within the scope of its authority. However, having decided to allow the minority shareholders' influence to disappear in the merger, consideration

---

[11]The *General Telephone* court noted: "In *Pac. Tel.,* . . . there was not the slightest suggestion that by following the commission orders . . ., Pacific's subscribers would have been furnished better service. [¶] . . . The contracts in *Pac. Tel.* which were so offensive to the commission had nothing to do with the 'relationship of the utility to the [consumer], nor did they affect 'the manner in which the utility provide[d] the affected services.' . . ." (*General Telephone, supra,* 34 Cal.3d 817, 827, quoting *Pac. Tel., supra,* 34 Cal.2d 822, 827.)

[12]The commission found that rates could be adversely affected by the cancellation of PT&T's voting preferred stock in that the stock would, in effect, be converted to common equity which, due to higher carrying costs of the latter stock, would increase PT&T's revenue requirement. The commission accordingly ordered an offsetting ratemaking adjustment in order to protect ratepayer interests. (9 Cal.P.U.C.2d 101, 123, 129-130.)

That finding and adjustment had nothing to do with "fairness" of the merger to minority (voting preferred *or* common stock) interests, and the commission went on to conclude: "Other than the impact which would result from the cancellation of PT&T's voting preferred stock, the merger would not appear to have any direct effect on the terms, conditions, or cost of service provided California ratepayers." (*Id.,* at p. 124; see also *id.,* at p. 129.)

of the merger's fairness to the disappearing minority was a matter beyond the commission's regulatory realm under sections 818 and 854.[13]

Appellant's class action does not involve issues falling within the commission's regulatory concern. Accordingly, the superior court has jurisdiction to entertain appellant's class action shareholder's suit despite the commission's decision.[14]

---

[13]We express no opinion on whether an exercise of jurisdiction under section 822 would yield a different result. Where application has been made for an order to issue certain securities in exchange for others, that section grants the commission discretionary authority to "approve the terms and conditions of such issuance and exchange, after a hearing upon the *fairness* thereof. . . ." (§ 822, italics added.)

The commission did not exercise jurisdiction under section 822. Respondents present a contrary argument to this court for the first time in a petition for rehearing, conveniently ignoring the fact that they tacitly conceded this point in their prior briefing. We address the issue for sake of clarity in the event respondents argue to a higher court, as they do here, that we have "overlooked" that matter to their prejudice.

Respondents' argument, built on a selective reading of the commission's decision, is that the commission impliedly relied on section 822 when it "concurred" in the view of its staff, which had advocated jurisdiction under section 822 in addition to sections 854 and 818. In context, however, the decision reads differently.

Having articulated PT&T's position that the commission had either no or only limited jurisdiction, the decision states: "[T]he Commission staff and other parties argue that we have jurisdiction to approve the merger. The staff argues that jurisdiction lies with the Commission under PU [Public Utilities] Code §§ 854, 818, and 822. Other parties urge jurisdiction under PU Code § 822. [¶] We concur in the staff view." (9 Cal. P.U.C. 101, 116-117.) The decision then goes on at length to explain that the merger involved an "acquisition" within the meaning of section 854 and an "issuance of stock" within the meaning of section 818. (*Id.,* at pp. 117-118.) Section 822 is not mentioned or cited.

The decision's painstaking analysis of sections 854 and 818, when contrasted with its silence as to section 822, implies rejection of section 822. By "concurring" in its staff's view, the commission was saying it had jurisdiction and rejecting PT&T's opposing view that it had none. Only two of the three possible sources of jurisdiction are explored, and rejection of the third is further implied by concurring with "the staff view" as opposed to the view of "other parties" who had urged jurisdiction under section 822. Finally, and ironically, PT&T had specifically argued before the commission that section 822 did *not* apply, reasoning that no party to the transaction had applied for a "fairness" finding and that, at any rate, no "exchange" was involved in the merger. It is inconceivable that the commission would have casually invoked section 822 in silence against those arguments.

[14]Relying on two cases in which compensation awards by the Industrial Accident Commission (IAC) were held immune from collateral attack, even though the awards facially demonstrated that the IAC had exceeded its "jurisdiction" in making them (*North Pacific S. S. Co.* v. *Soley* (1924) 193 Cal. 138, 140-141 [223 P. 462], app. dism., 267 U.S. 583 [69 L.Ed. 798, 45 S.Ct. 353]; *Thaxter* v. *Finn* (1918) 178 Cal. 270, 274-278 [173 P. 163]), respondents urge (italics theirs): "[S]ection 1759 forecloses any attempt to reverse, review or otherwise interfere with the Commission's decision *regardless whether plaintiff's complaint is that the Commission acted beyond its jurisdiction.* Plaintiff's remedy was to seek rehearing by the Commission, not the collateral attack that he attempted in the court below."

The argument is misguided. First, in the cases cited, the IAC exceeded its "jurisdiction" only in the sense of making an award that it was not authorized to make under the facts presented. The award in *North Pacific* was made to an injured stevedore who should have been compensated under maritime law. (*North Pacific S. S. Co.* v. *Soley, supra,* 193 Cal. 138, 139.) The award in *Thaxter* was made against persons other than the applicant's immediate employer. (*Thaxter* v. *Finn, supra,* 178 Cal. 270, 272.) In neither case did the

## III

It follows from the foregoing discussion that the commission's conclusions and findings as to the merger's fairness to minority shareholders, and related issues, will not have a res judicata or collateral estoppel effect in the superior court action.

While final orders and decisions of the commission are generally conclusive in all collateral actions and proceedings, that is only so as to determinations within the commission's jurisdiction. (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630 [268 P.2d 723]; § 1709.) The fairness determinations were in excess of the commission's jurisdiction.

The doctrine of collateral estoppel precludes relitigation of an issue only if the issue was *necessarily decided* in the prior adjudication. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 910 [226 Cal.Rptr. 558, 718 P.2d 920].) The fairness issues, being beyond the commission's jurisdiction to decide, were obviously not necessary to its decision. (Cf. *United States* v. *R. C. A., supra,* 358 U.S. 334, 352 [3 L.Ed.2d 354, 366].)

### DISPOSITION

The judgment of dismissal is reversed. Appellant shall recover costs under rule 26 of the California Rules of Court.

Rouse, Acting P. J., and Benson, J., concurred.

A petition for a rehearing was denied November 20, 1986, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 14, 1987.

---

IAC lack fundamental subject matter jurisdiction, which *would* have rendered the awards subject to collateral attack. This was expressly acknowledged in *Thaxter,* in words equally applicable to *North Pacific.* (*Ibid.;* see general discussion in *City and County of San Francisco* v. *Ang* (1979) 97 Cal.App.3d 673, 677-678 [159 Cal.Rptr. 56].)

Second, appellant does not "collaterally attack" the commission's decision. The commission decided that the merger, notwithstanding objections by minority shareholders, was in the public interest. Appellant does not seek to have that decision declared void—only to argue that the commission's incidental determination of fairness should not oust the superior court of jurisdiction over his class action suit. It is only in that context that he challenges the commission's "jurisdiction."